In re CONCRETE STRUCTURES, INC.,
et al., Debtor-in-Possession.

CONCRETE STRUCTURES, INC. and
National Acceptance Company of
America, Plaintiffs,

v.

OXFORD DEVELOPMENT
CORPORATION,
Defendant.

Bankruptcy No. 78–00686.

United States Bankruptcy Court,
E.D. Virginia,
Richmond Division.

Sept. 30, 1982.

Charles F. Witthoefft, Richmond, Va., for Nat. Acceptance Co. of America.

Theodore J. Markow, Richmond, Va., for Concrete Structures, Inc.

Alfred Jerome Owings, Richmond, Va., Thomas N. Biddison, Jr., Saul E. Gilstein, Gallagher, Evelius & Jones, Baltimore, Md., for Oxford Development Corporation.

## MEMORANDUM OPINION

BLACKWELL N. SHELLEY, Bankruptcy Judge.

This matter comes on upon the filing by Concrete Structures, Inc. (Structures), the debtor-in-possession, of an objection to the allowance of Claim No. 450 filed by Oxford Development Corporation (Oxford) and upon Structures' counterclaim for recovery of money owed it by Oxford. National Acceptance Company of America (NAC) filed for leave to intervene as a party plaintiff in this proceeding alleging it had a perfected security interest in Structures' accounts receivable. This Court on March 25, 1981 granted NAC's motion to intervene and made NAC a party plaintiff. After trial and upon the submission of briefs this Court makes the following determination.

## STATEMENT OF THE FACTS

Oxford and Structures entered into a subcontract agreement dated September 15, 1977 which provided that Structures would fabricate and erect precast concrete Quad-Tees and Spandrel Beams at the Kirkwood House Construction Project in Baltimore, Maryland. Oxford served as the project's general contractor. The contract price as adjusted was $344,429.00. The contract price included $83,247.53 which was allocated to the transportation and erection of the concrete pieces.

Structures began the project and completed its responsibilities in the construction of the first floor of Kirkwood House. Structures invoiced Oxford $69,667.86 for the work it had completed and Oxford paid Structures $7,000.00 of that obligation leaving an unpaid balance of $62,667.86. Due to financial difficulties, Structures was un-

able to continue working on the project and Oxford notified Structures on June 14, 1978 that it had defaulted. Structures filed a petition in bankruptcy under Chapter XI of the Bankruptcy Act on June 29, 1978.[1]

Structures and Oxford entered into an agreement on July 3, 1978 by which Oxford agreed to perform certain responsibilities which previously were within Structures' scope of work under the subcontract of September 15, 1977. Oxford agreed to transport, erect and finish the Spandrel Beams and Quad-Tees and Structures agreed to continue to manufacture those materials. Kirkwood House required specially made materials and Oxford needed those materials in order to complete the building. Oxford's employees testified that employment of another company at that time to produce the materials would have been too costly.

The July 3, 1978 agreement provided that Structures would continue to provide Oxford with the Quad-Tees and Spandrel Beams. Oxford agreed to pay Structures, on a current basis for work performed, all funds owed it less 10% retention for goods and materials supplied subsequent to June 29, 1978 without setoff for any claims Oxford had or may have had against Structures arising prior to June 29, 1978. Oxford

agreed to release on August 6, 1978 the balance of the pre-chapter unpaid account provided the precast items associated with the first two floors of Kirkwood House were completed and delivered.[2]

Oxford agreed in the July 3, 1978 contract to advance Structures $20,000.00 so that Structures would have working capital to continue casting the Quad-Tee planks.[3]

Paragraph 5 of the July 3, 1978 agreement is the parties' chief area of contention. This paragraph deals with the sources from which payment would be made.[4] Oxford's total cost of delivery and erection exceeded the $83,247.53 estimated in the original contract as the cost for that work. Prior to default Structures performed $11,299.16 of the delivery and erection work leaving unperformed work estimated to be $72,018.37. Oxford claims its actual costs totaled $262,431.00. Oxford claims Structures owes it $128,766.17.[5]

Structures provided Oxford with the Quad-Tees and Spandrel Beams and Oxford paid Structures a total of $207,964.17, $7,000.00 of which was paid prior to July 3, 1978. Structures provided Oxford all of the materials it was required to supply under the contract except for beams which were

1. The Bankruptcy Act of 1898 was repealed and superseded by the Bankruptcy Code on October 1, 1979; however, because Structures filed its bankruptcy petition before the Code became effective, the Act is the law applicable in this case.

2. Paragraph three of the July 3, 1978 agreement provides that "[u]pon the completion and delivery of two full floors of concrete plank and all other precast items associated with these floors not later [than] the 6th of August, Buyer agrees to release to Structures all amounts due under the terms of its Old Contract less the 10% retention and less the advance made in accordance with the provisions of paragraph 4 of this Agreement."

3. The contract contradicts itself on the source of the $20,000.00 advance. Paragraph 3 indicates the advance should be made from the pre-chapter account fund of $62,667.86. Paragraph 4 provides that the $20,000.00 advance would be credited against materials to be supplied under the agreement.

4. Paragraph 5 of the July 3, 1978 agreement provides that "... the costs of such transportation, erection and flash patching and feathering of floors shall be deducted from any monies owing or otherwise due [Structures] under the terms of the Agreement, except that such deductions shall not exceed from current payments the following amounts ... [estimated by the parties as $72,018.37].

Any excess amounts paid or agreed to be paid by the Buyer, which shall not include the Buyer's normal overhead costs, to accomplish the portion of the scope of work covered by this paragraph (5) shall be off-set first against amounts due under the provisions of paragraph (3) of this Agreement and secondly against retainage held in accordance with paragraph (2) of the Agreement. Any savings shall be credited to the debtor-in-possession."

5. Oxford derived this figure by subtracting $61,646.46, the amount Oxford admits it owes Structures, from $190,412.63, the amount Concrete allegedly owes Oxford for its gross loss before invoking the contract's setoff provisions.

site-cast by Oxford and for which $2,800.00 was deducted from the original contract price.

The total contract originally provided for the payment of $344,429.00 upon the completion of Structures' part of the contract; however, Structures failed to perform work it estimated would cost $72,018.37.

Representatives of both Oxford and Structures testified at trial concerning their interpretations of the July 3, 1978 contract. David Richard Lewis, an Executive Vice President of Oxford, testified that Oxford wanted the right to offset cost overruns on the work it assumed under the contract with Structures. He said that the agreement of July 3, 1978 was intended to provide Structures on a week by week basis with the working capital necessary to continue production, and that the weekly payments for the accomplished work minus the 10% retainage held by Oxford would cover Structures' ongoing cost of operations. He further stated Oxford would deduct the retainage from the construction money owed Structures and at reconciliation Oxford would recover costs in excess of that withheld from interim payments and retainage, and that Structures would recover the difference if less were spent. Lewis said Oxford retained $62,667.86 of the original $69,-667.86 Oxford owed Structures under the original contract to offset against any overruns. He said that although paragraph 3 indicated that Oxford would pay Structures the balance due on the $69,667.86 by August 6, 1978 provided on or before that date the first two floors of concrete plank and other

precast items for Kirkwood House had been completed and delivered, if the amount due under the old contract had been paid by August 6 Oxford would still be able to offset an equivalent amount for cost overruns on the erection, transportation and finishing. He understood Oxford also would be able to recover for all overruns and would have a claim against Structures for all monies spent on the contract. Lewis based his claim that Oxford was entitled to reimbursement for all cost overruns on paragraph 1 of the July 3, 1978 agreement which provided that the scope of working materials and working conditions of that agreement would be in accordance with the provisions of the old contract dated September 15, 1977 which was incorporated in the July 3 contract. The old contract provided that upon default if the owner accomplished any work on behalf of the subcontractor, the subcontractor was totally responsible for the cost of all that work.[6]

R.P. Ellison, Jr., who represented Structures in the contract negotiations with Oxford in July, 1978, testified that Structures never intended to guarantee all cost overruns Oxford might incur. He said that Oxford wanted to retain the $42,667.86 of the $62,667.86 owed under the old contract as a source for its overrun costs and after payment of that fund Oxford wanted to use the retainage under the new contract as a reserve with which to fund any overrun costs.[7] He said the parties agreed that the retainage figure would be 10% of the contract performed by Structures.[8] He contended that the retainage figure was 10% of

6. Paragraph 13 of the original contract provided that Oxford had the right, in the event of a default by Structures, to withhold further payments to Structures and to make other arrangements to complete the work. At the completion of the work Oxford had the right to reconcile the total costs and in the event there were any savings from the original contract Oxford would pay that amount to Structures. Likewise, in the event Oxford incurred cost overruns, Structures would be liable and would pay the difference. Paragraph 1 of the July 3, 1978 agreement noted the scope of work and the terms and conditions of the agreement would be in accordance with the terms of the original contract dated September 15, 1977 which was

incorporated by reference into the July agreement.

7. Ellison interpreted the July 3 contract as providing the $20,000.00 advance would be deducted from the $67,667.87 originally owed by Oxford, thus he contends $42,667.86 remains to be paid by Oxford on that pre-chapter account.

8. Oxford contends it is entitled to $34,442.00 under the retainage provisions because the original contract amount totaled $344,420.00. Structures argues the retainage figure should be 10% of $207,960.00, the amount it was paid under the contract.

the amount of the contract Structures performed and not that amount which it had contracted to perform. Ellison agreed that the provisions of paragraph 5 of the July 3 agreement contemplated a contract reconciliation; however he indicated that at reconciliation the offset would be applied first against the $42,667.86 due under the provisions of paragraph 3 and secondly if that amount had been paid as of August 6, 1978, the offset would be applied against retainage held in accordance with paragraph 2. The parties included this clause because initially there was no retainage against which Oxford could offset costs.

Ellison testified that Lewis wanted a contingency fund against which overruns could be offset. He said Lewis stipulated that until there was a sufficient retainage, Oxford would use the unpaid amount from the old contract as a source for the overrun costs. After Oxford paid Structures those funds Oxford would use the 10% retainage as reserve against overrun costs. Ellison also testified that initially he objected to allowing Oxford to insert in the contract the 10% retainage clause, but he said he was so certain that Oxford could complete the erection and delivery for these allowances that he agreed to that figure, "... but not one penny in excess of the retainage."

Oxford spent $262,431.00 to complete the part of Structures' contract it assumed, $190,412.00 in excess of Structures' estimate. Structures estimated in its bid that completion of these tasks would cost approximately $83,247.53 and it spent $11,-229.16 on this phase of the project before defaulting. The parties differ whether the $262,431.91 cost to Oxford was reasonable. Oxford argues that the added cost was necessitated by the poor quality of workmanship found in the materials provided by Structures, by Structures' delays in providing Oxford with the materials, and by Structures' original underestimation of its costs for doing that part of the work.

NAC had a prior perfected security interest in Structures' accounts receivable as of the filing of Structures' petition in bankruptcy. (See Order entered herein, Oct. 27, 1978).

The July 3, 1978 contract was to be performed in Maryland. At the close of Oxford's evidence the Court took under consideration the motions to dismiss and for summary judgment made by NAC and Structures.

## CONCLUSIONS OF LAW

The parol evidence rule generally precludes the reception of evidence which varies an agreement. *Coopersmith v. Isherwood,* 219 Md. 455, 150 A.2d 243, 246 (1959). Maryland law provides, however, that extrinsic evidence may be used to determine the intention of the parties "... when the language or words, used in their ordinary sense, are vague, doubtful or have two meanings ...." *Id.* This Court is obliged to use Maryland's parol evidence rule in the instant case because a federal court must apply the substantive law of the state in which it is sitting. *Erie Railroad Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). Virginia law provides that the parol evidence rule is a substantive matter so Virginia courts would use Maryland law, the law of the state in which the contract was entered into and in which the contract was to be performed. *See Lewis v. Lowry,* 322 F.2d 453, 455 (4th Cir. 1963); *Zehler v. E. L. Bruce Co.,* 208 Va. 796, 160 S.E.2d 786, 787 (1968). Maryland law provides that the parol evidence rule is substantive so this Court must apply Maryland law concerning this rule because Virginia courts would apply Maryland law in a like case. *Pumphrey v. Kehoe,* 261 Md. 496, 276 A.2d 194, 195 (1971).

The litigation in the instant case arises because the contract the parties entered into is vague, ambiguous and poorly written. The parties failed to contemplate a cost overrun of the magnitude alleged by Oxford and the contract is of only partial aid to the Court in determining which party should bear the costs. As a result parol evidence was properly and necessarily received at trial in order to aid this Court in reaching a correct interpretation of the agreement.

■ The parol evidence rule is a useful tool where parties to a contract express their agreement in writing and intend that that agreement embody the full and final expression of their bargain. *Coopersmith* at 246. In such cases the rule allows courts to enforce the parties' apparent intentions as to the terms of the bargain. If the meaning of the agreement had been clear, parol evidence would have been inadmissible; however, in the instant case the parties' interpretations were essential to this Court's construing the contract. *Allen v. Steinberg,* 244 Md. 119, 223 A.2d 240, 245 (1965).

■ In construing and interpreting a contract the Court must ascertain and give effect to the intention of the contracting parties. *Kasten Construction Company, Inc. v. Rod Enterprises, Inc.,* 268 Md. 318, 301 A.2d 12, 18 (1973). When a contract is ambiguous and capable of conveying two meanings, the parties may testify as to their intentions at the time they entered into the contract and the court must construe the contract to give effect to the parties' intentions as they existed at that time. *Hardy v. Brookhart,* 259 Md. 317, 270 A.2d 119, 125 (1970). Testimony by representatives of the parties at trial indicates that both parties entered into the July 3, 1978 contract with substantially different intentions and that both parties believed the contract accurately reflected those intentions. Furthermore, it appears that the parties failed to foresee a cost overrun of this size. In light of the parties' failure to provide for a cost overrun situation such as occurred in the instant case, and considering the parties' different interpretations of the contract's applicability to the cost overruns, this Court must turn to Maryland law on the construction of contracts.

■ First, courts prefer to construe contracts to make them effective rather than to render them illusory or unenforceable. *Cadem v. Nanna,* 243 Md. 536, 221 A.2d 703, 708 (1966). Second, courts must give contracts a reasonable rather than an unreasonable construction. *Id.* Third, an ambiguous contract ought to be construed against the party which prepared that contract. *Id.* Fourth, courts prefer the interpretation of a contract which makes it fair and reasonable instead of an interpretation which leads to a harsh or unreasonable result. *Canaras v. Lift Truck Services, Inc.,* 272 Md. 337, 322 A.2d 866, 877 (1974). "Where the language of a contract is open to an interpretation which is reasonable and in accordance with the general purpose of the parties, the hardship of a different interpretation is strong ground for belief that such a meaning was not intended." *Sorenson v. J. H. Lawrence Co.,* 197 Md. 331, 339, 79 A.2d 382, 386 (1951). In light of the rules of construction this Court faces the following issues in determining what each party is owed under the July 3, 1979 agreement. These issues are:

1. Do the provisions of paragraph 5 of the July 3, 1978 agreement limit the amount of the losses Oxford can setoff against monies due or paid to Structures?

2. What is the amount of the retainage available for setoff provided for in paragraph 5 of the July 3, 1978 agreement?

3. Was the pre-chapter account available for setoff by Oxford?

4. Is NAC entitled to recover the pre-chapter account?

### 1. Limitations of Paragraph 5

Paragraph 5 provides that the cost of transportation, erection, flash patching and feathering would be deducted from any monies owing or due Structures by Oxford except that such deductions would not exceed from current payments that which Structures had estimated the balance of the work would cost. Oxford claimed its total cost was $262,431.00 to accomplish the work which Structures estimated would cost $72,018.37. The parties agree there was to be some type of reconciliation at the end of the contract. Structures argues that this reconciliation was related solely to the cost of transportation ·and erection. Structures further argues that the $42,000.00 owed . Structures was available to Oxford for setoff prior to August 6, 1978 but thereafter

was unavailable for purposes of setoff. Structures contends Oxford may utilize its right of setoff only against the retainage in accordance with paragraph 2 of the July 3, 1978 agreement.

Paragraph 5 deals with the allocation of the costs resulting from Oxford's undertaking several of Structures' responsibilities. The section provides for the offset of cost overruns against amounts due under the provisions of paragraph 3 and against the retainage held in accordance with paragraph 2. The section mentions nothing about any other offsets. This Court must construe this contract reasonably. *Cadem* at 708. Oxford unreasonably claims that on account of the clause in the July 3 agreement which incorporates into that contract the provisions of the original contract, Oxford is entitled to compensation for all cost overruns incurred in completing the work. The July 3, 1978 agreement does not mention the possibility of such an indemnification for cost overruns. Furthermore, it would not have been necessary for the parties to have included all of paragraph 5's provisions if Oxford would have been able to have recovered all of its cost overruns at reconciliation day. Next, it appears Oxford prepared the contract and insisted on the inclusion of several of these provisions. In case of an ambiguous contract, the contract should be construed against the party which prepared it. *Cadem* at 708. Paragraph 13 of the original contract and paragraphs 3 and 5 are clearly inconsistent. Paragraph 13 of the Old Contract entitled Oxford to use the balance of Structures' contract money to finish Structures' contract in the event of default and it further provided Structures would be liable for any costs in excess of the contract amount. Paragraphs 3 and 5 provide that the funds retained by Oxford may be used to offset such costs. The July 3 agreement provides for no other source of recovery for overruns. Finally, Oxford's contention that it is entitled to compensation for all cost overruns would lead to a harsh and unreasonable result.

■ At the time Structures defaulted, Oxford explored the possibility of hiring another firm to complete Structures' obligations, however, Oxford quickly discovered that in light of its time constraints, it was necessary to hire Structures to complete the work. It is at that point Oxford entered into the new contract with the debtor-in-possession. The new contract had different provisions protecting Oxford including the retainage provision and the retention of the amounts not paid Structures at the time of default. Oxford was forced to accept these terms by economic necessity. Although Oxford gave up the right to pursue Structures for the entire amount of the overages, that right would have been of little benefit to Oxford in any case because its claim would have been for a pre-petition contract obligation and any recovery would have been at a reduced amount or not at all in the event of a liquidation bankruptcy. Oxford gave up the right to proceed against Structures for this certain amount in return for the opportunity to keep the retainages as protection for any future overruns. It is unrealistic to believe Structures would have accepted the risk of underwriting Oxford's entire cost of performance in exchange for the opportunity to enter into a new contract. Both parties needed the contract. Oxford needed Structures to finish its work and Structures needed the income the contract would produce. There was no incentive for Structures to enter into an onerous contract in which it agreed to underwrite the entire cost of performance in the event of default. A reasonable interpretation of this contract leads the Court to conclude that Structures would be liable only to the extent of the retainages.

## 2. Retainage

■ Paragraph 5 of the July 3, 1978 agreement provides in pertinent part that "any excess amounts paid or agreed to be paid by [Oxford] . . . to accomplish the portion of the scope of work covered by this paragraph (5) shall be offset first against amounts due under the provisions of paragraph (3) of this Agreement and secondly against retainage held in accordance with paragraph (2) of this Agreement." Paragraph 2 referred to in this quote provides

that Oxford agreed to pay on a current basis to Structures for work performed in accordance with the agreement all funds less 10% retention ". . . for goods or materials supplied subsequent to the [sic] 29 June 1978 without setoff . . . ." This section is clear. Oxford was allowed to retain 10% of the funds it owed Structures for goods and materials supplied subsequent to June 29, 1978, not 10% of Structures' contract. Oxford paid Structures $200,964.17 for goods and materials supplied after June 29, 1978. Oxford paid $7,000.00 prior to the July 3, 1978 agreement. This Court concludes the amount of the retainage which is available pursuant to paragraph 5 of the agreement is $20,096.00. The $34,442.00 figure urged by Oxford is clearly incorrect because paragraph 2 of the agreement refers to work completed by Structures.

### 3. Oxford's Right of Setoff Against the Pre-Chapter Account

■ Paragraph 5 provides in pertinent part that Oxford's overruns ". . . shall be offset first against amounts due under the provisions of paragraph 3 of this agreement . . . ." Paragraph 3 of the agreement provides that "[u]pon the completion and delivery of two full floors of concrete plank and all other pre-cast items associated with these floors not later than the 6th of August, Buyer agrees to release to Structures all amounts due under the terms of its old contract less the 10% retention and less the advance made in accordance with the provisions of paragraph 4 of this agreement." Again the contract is inconsistent and the balance of the pre-chapter account owed Structures by Oxford is not clearly ascertainable. Paragraph 3 of the July 3 contract provides that upon the completion and delivery of two full floors of concrete plank and precast items not later than the 6th of August Oxford would release to Structures the pre-chapter accounts less the $20,000.00 advance. These sections are clearly inconsistent. Lewis testified that he thought the advance would be credited against materials supplied after July 5, 1978 as indicated in Paragraph 4 of the July 3 agreement. Ellison testified he believed

the $20,000.00 advance was to be made from the pre-chapter account as so indicated in Paragraph 3 of the July 3 agreement. This Court concludes in light of these inconsistencies that the $20,000.00 advance was made from the pre-chapter account due Structures. Under that pre-chapter account $42,667.86 remains unpaid. This conclusion is supported both by Maryland law which details the manner in which ambiguous contracts should be construed and by the actual payment of funds due Structures. Oxford paid Structures $207,964.17 during the course of the contract, $7,000.00 of which was paid prior to July 3, 1978. It appears from these facts that Oxford never withheld $20,000.00 from these amounts paid subsequent to July 3, 1978. The actions of the parties, therefore, confirm that the $20,000.00 advance was actually deducted from the pre-chapter account.

■ No witness testified that Structures fulfilled its obligation under paragraph 3 on or before August 6, 1978. Ellison testified he did not know when the work was completed. Absent any evidence that the work was completed by August 6, 1978 this Court must conclude that Structures completed its obligation under paragraph 2 late and was not entitled to payment of the $42,667.86 at that time. Because the work was not completed timely, Oxford did not pay Structures and may use those funds to offset any cost overruns incurred.

■ Additionally, Paragraph 5 of the July 3 agreement provides that excess amounts paid by Oxford could be offset against amounts *due* under provisions of Paragraph 3. Having found previously that $20,000.00 of the amount that was due was paid at the time the July 3 agreement was entered into, $42,667.86 still remains *due* and can be used as an offset for cost overruns even if the evidence shows a timely compliance with that particular term of the agreement.

This Court concludes that at least to the extent of the $63,764.28 in retainages, Oxford's overrun costs were reasonable.

### 4. NAC's Right to Recover the Pre-Chapter Account

NAC alleges its perfected security interest in Structures' accounts receivable is superior to Oxford's setoff claim in the pre-chapter accounts. NAC also contends any agreement by Structures permitting an offset against the pre-chapter accounts by Oxford would constitute a preferential payment to Oxford. Finally, NAC contends that the July 3, 1978 agreement permitting Oxford the right of setoff was not in Structures regular course of business and, therefore, was prohibited absent approval of the court.

An assignee of rights under a contract stands in the shoes of the assignor and has no greater rights against the account debtor than did the assignor. *Farmers Acceptance Corporation v. DeLozier,* 178 Colo. 291, 496 P.2d 1016, 1018 (1972). This proposition has been incorporated in the Uniform Commercial Code which has been adopted by the state of Maryland and which provides that the rights of an assignee are subject to "... [a]ll the terms of the contract between the account debtor and the assignor and any defense or claim arising therefrom; and (b) any other defense or claim of the account debtor against the assignor which accrues before the account debtor receives notification of the assignment." *Md.Code Ann.,* § 9–318(1)(a), (b) (Commercial Law). "Claim" includes setoffs. *Farmers Acceptance Corporation* at 1018. NAC's rights in Structures' accounts receivable therefore is subject to any defense or claim Oxford may have against Structures. *See Hudson Supply & Equipment Company v. Home Factors Corp.,* 210 A.2d (D.C.) 837 (1965); *James Talcott, Inc. v. H. Corenzwit and Company,* 76 N.J. 305, 387 A.2d 350 (1978). Pursuant to Article 13 of the original contract, upon Structures' default Oxford had the right to withhold any funds due Structures for the purpose of finishing the work subcontracted to Structures. Oxford had the right to offset prior to the renegotiation of the contract. *Maryland Code* § 9–318(2) (Commercial Law) allows good faith modifications of an assigned contract as long as the assigned right to payment has not been earned and the assignee's rights have been continued in the modified contract.[9] Oxford and Structures modified the original contract by entering into a new contract on July 3, 1978 which provided Oxford with the potential right of offset against the $62,667.86 unpaid under the original contract. Because Structures defaulted under the old contract and Oxford had the ensuing right to withhold further payments under that contract, NAC's interest in Structures' accounts receivable was not materially harmed by the contract modification. The new contract continued Oxford's rights to offset overruns against amounts due Structures. NAC can rise no higher than its assignor.

Structures' right to payment under the contract was conditioned upon the completion of the first two floors of Kirkwood House by August 6, 1978. Absent completion by that date Oxford had the right to use the funds remaining under the original contract to offset its overrun costs.

### SUMMARY

Although Oxford owes Structures $61,-646.46 on account of materials supplied after July 3, 1978, it is entitled to offset its overrun costs against the $42,667.86 retained under the original contract and against the $20,096.42 retained under the July 3, 1978 agreement. Oxford may recover no more funds from Structures than it retained under the contract. Neither party is entitled to recover any more funds from the other. NAC is not entitled to recover

---

9. "So far as the right to payment under an assigned contract right has not already become an account, and notwithstanding notification of the assignment, any modification of or substitution for the contract made in good faith and in accordance with reasonable commercial standards is effective against an assignee unless the account debtor has otherwise agreed or the assignee acquires corresponding rights under the modified or substituted contract. The assignment may provide that such modification or substitution is a breach by the assignor." *Md.Code Ann.* § 9–318 (Commercial Law).

any of the pre-chapter account funds it claims in this action.

An appropriate Order will issue.