**In re SUNBELT VACATION TRAVEL, INC., Debtor.**

**PERDIDO PASS RESTAURANT, Dale E. McMath and Helen V. McMath, Plaintiffs,**

**v.**

**SUNBELT VACATION TRAVEL, INC., Defendant.**

**Bankruptcy No. 88–01551.
Adv. No. 88–1276.**

United States Bankruptcy Court, S.D. Alabama, S.D.

Nov. 23, 1988.

Beth McFadden Rouse, Mobile, Ala., for Perdido Pass Restaurant, Inc.

Barry A. Friedman, Mobile, Ala., for debtor.

Stephen R. Windom and M. Donald Davis, Jr., Mobile, Ala., for Perdido Pass Properties.

## ORDER

ARTHUR B. BRISKMAN,
Bankruptcy Judge:

This matter came on for hearing on the Motion for Relief from Stay filed by Perdido Pass Restaurant, Inc., requesting permission to setoff $59,866.03 in withheld rent payments against money owed to its principals by the Debtor. Also before the Court is a counterclaim filed by the Debtor requesting a turnover of the withheld funds. Appearing were Beth McFadden Rouse, attorney for Movant, Stephen R. Windom and M. Donald Davis, Jr., attorneys for Perdido Pass Properties, and Barry A. Friedman, attorney for the Debtor. Having reviewed the matter, the Court makes the following findings of fact and conclusions of law.

## FINDINGS OF FACT

1. Perdido Pass Properties (hereafter "the Partnership"), an Alabama partnership, entered into a lease agreement on May 21, 1985, with The Perdido Pass Restaurant, Inc. (hereafter "the Restaurant"), to lease to the Restaurant certain real property owned by the Partnership for purposes of operating a restaurant.

2. On August 22, 1985, the Partnership borrowed money from First Federal Savings and Loan Association (currently known as and hereafter referred to as "Altus Bank") and gave the Bank a mortgage on the property in question.

3. The mortgage provided, *inter alia*, that the Partnership assigned its rents to the mortgagee to secure the debt, and further, that the principal amount might be accelerated upon any subsequent assignment to others.

4. On June 24, 1986, the Partnership sold the subject property to Sunbelt Vacation Travel, Inc. (hereafter "the Debtor"). A vendor's lien deed was executed on that date, which provided, *inter alia*, that the Debtor took the property subject to Altus' mortgage, and agreed to abide by the terms of the mortgage. The vendor's lien was recorded on June 25, 1986.

5. In conjunction with the sale of the subject property to The Debtor, the Partnership executed an assignment of its leases and rents in the property to the Debtor. Among those leases assigned was that of the Restaurant.

6. In addition to the vendor's lien deed executed on June 25, 1986, a security agreement was entered into on the same date in which the Debtor gave the Partnership a security interest in, *inter alia*, the leases and rents and payments under leases of the property. The Debtor also agreed not to transfer any of the collateral without the consent of the Partnership, to keep the collateral free of other liens, and that upon a default, the Partnership could demand possession to the collateral.

7. In order to perfect the security agreement, a UCC–1 financing statement was filed by the Partnership in the Probate Court of Baldwin County, in which county the subject property is located, on June 25, 1986. On June 27, 1986, a UCC–1 was similarly filed with the Secretary of State of Alabama. Among the items of collateral covered by the financing statements are the leases and rents of the subject property.

8. On May 11, 1988, Dale and Helen McMath, the individual owners of the Restaurant, as well as individual guarantors on the lease with the Debtor, made a loan to the Debtor in the amount of $100,000.00. A note was executed on May 13, 1988, evidencing the loan and providing for payment in sixty days together with ten percent (10%) interest per annum.

9. On May 31, 1988, an addendum was added to the lease between the Restaurant and the Debtor which provided upon the Debtor's default on the repayment of the debt to the McMaths the Restaurant would be authorized to credit rent payments due to the Debtor against the note indebtedness.

10. On July 15, 1988, the Restaurant first withheld rents otherwise due to the Debtor based on the Debtor's default on the note. The amount withheld was $8,817.86. At that time the debt owed to

the Restaurant by the Debtor was $101,753.60.

11. Further rent amounts were subsequently withheld as follows: August 1, 1988—$12,640.00; August 15, 1988—$12,428.55; September 1, 1988—$9,840.00; September 15, 1988—$5,670.52; October 1, 1988—$7,600.00; October 15, 1988—$2,869.10.

12. On August 9, 1988, the Restaurant was notified by the Partnership that future rents should be sent to the Partnership due to the Debtor's default on its payments to the Partnership.

13. The Debtor filed a petition under Chapter 11 of the Bankruptcy Code on September 7, 1988.

14. The Restaurant filed the instant motion for relief from the stay seeking authorization to setoff the rents it has withheld against the loan indebtedness of the Debtor. The Restaurant also claims a right to setoff $3,384.61 expended in repairing the property. The Debtor on the other hand, requests that the withheld rent payments be turned over.

15. On November 14, 1988, the Court entered an interlocutory Order requiring the Restaurant to turn over to the Debtor funds representing withheld postpetition rents. The Restaurant was further ordered to pay over to the Clerk of the Bankruptcy Court the funds representing withheld prepetition rents.

16. This is a core proceeding as defined in 28 U.S.C. § 157(b)(2). This Court has jurisdiction over this proceeding pursuant to 28 U.S.C. § 157(b)(1).

## CONCLUSIONS OF LAW

Section 542(b) of the Bankruptcy Code provides an entity that owes a debt to the bankruptcy estate shall turn over said debt, except to the extent it is subject to setoff under Section 553 of the Code against a claim against the Debtor. 11 U.S.C. § 542(b). Applied to the instant case, *if* The Restaurant owes a debt to the Debtor, it must be paid *unless* it may be setoff under Section 553 against a debt the Debtor owes to the Restaurant. With certain exceptions, Section 553 of the Code allows setoff to the extent that it is available under applicable nonbankruptcy law. 11 U.S.C. § 553.

The Restaurant is before the Court requesting the stay be lifted to allow the retention of the rents it has withheld. The Debtor having asserted a counterclaim for a Section 542 turnover, the Restaurant submits two theories, actually equitable defenses, on which it should be allowed to retain the rents: recoupment and setoff.

Conspicuously absent in the language of both Section 542 and 553 is any mention of recoupment. A debt must be paid "except to the extent that such debt may be offset under Section 553 ..." 11 U.S.C. § 542(b). Perhaps the difference in the two defenses explains this. Setoff is a type of "confession and avoidance"; the debt is owed but the defendant is not required to pay it because of an offsetting debt. *Alabama Power Co. v. Kendrick*, 219 Ala. 692, 123 So. 215 (1929). *Carolina Portland Cement Co. v. Alabama Construction Co.*, 162 Ala. 380, 50 So. 332 (1909). A plea of recoupment, however, avers that the full debt is not owed because of some act of the plaintiff. *Alabama Power Co., supra.* Since the wording of Section 553 pertains to debts owed to a debtor which may be setoff, recoupment is by definition not within the ambit of Section 553. *Accord* 4 *Collier on Bankruptcy* 553.03 (15th Ed. 1988) and the cases cited therein.

Therefore, if the Restaurant can successfully assert recoupment, there is no debt owed to the Debtor, at least to the extent of the Debtor's claim against the Restaurant. If there is no debt, the application of Section 553 is unnecessary. If recoupment is not allowed, however, the Court must reach the issue of whether setoff is available under Alabama law, and if so, to what extent bankruptcy limits that setoff.

## I. RECOUPMENT

Recoupment has been defined as "the right of a defendant, in the same action, to cut down the plaintiff's demand either because the plaintiff has not complied with some cross obligation of the contract on

which he sues or because he has violated some duty which the law imposes on him in the making or performance of that contract." 20 Am.Jur.2d, *Counterclaim, Recoupment, Etc.* 1 (1965); *See also Carolina Portland Cement Co. v. Alabama Construction Co.,* 162 Ala. 380, 50 So. 332 (1909). Recoupment is a recognized equitable defense in Alabama. *Norton v. Bumpus,* 221 Ala. 167, 127 So. 907 (1930). *Carolina Portland Cement Co., supra.*

Crucial to successful recoupment is the requirement the subject matter of the plea of recoupment must arise out of the same transaction upon which the plaintiff's claim is based. *Scroggins v. Alabama Gas Corporation,* 275 Ala. 650, 158 So.2d 90, 95 (1963); *Norton v. Bumpus, supra.* Thus, recoupment has been allowed by a defendant in an assault and battery case who seeks damages for assault committed by the plaintiff at the same time, *Brown v. Patterson,* 214 Ala. 351, 108 So. 16 (1926), and allowed by a defendant in a suit for work and labor done seeking damages for negligent performance by the plaintiff. *Burnett & Bean v. Miller,* 205 Ala. 606, 88 So. 871 (1921).

The dispositive issue as to recoupment is whether the note claim of the McMath's arose from the same transaction as the Debtor's claim for the rents. The issue is further refined to whether the addendum to the lease allowing the application of rents against the loan indebtedness forms a sufficient nexus to unite the two debts into the same transaction. Without the addendum, there is no connection between the loan and the rents.

On May 31, 1988, the date the addendum to the Debtor–Restaurant lease was executed, the Partnership held a perfected security interest in the lease and rents of the Debtor by virtue of the Security Agreement entered into on June 24, 1986. Altus also held a security interest in these rents pursuant to its mortgage, subject to which provisions the Debtor bought the property. The question is whether the Debtor had the power to amend the lease with the provision for the crediting of rents, when those same rents were already pledged as collateral to both the Partnership and Altus.

In *F.W. Woolworth Co. v. Buford–Clairmont Co.,* 769 F.2d 1548 (11th Cir.1985), the Eleventh Circuit construed Alabama law and held that a termination of a lease was invalid and of no effect where the party asserting the termination had assigned the lease and rents as collateral for a loan without obtaining the consent of the assignee for the termination, as was required under the terms of the assignment agreement. The Court noted as follows:

> In assigning the lease ... [the assignor] *contractually* relinquished its right and power to terminate the lease without the consent of [the assignee]. Without such consent, [the assignor] was without any power to terminate the lease agreement ... A contrary holding would permit every secured lender holding an assignment of a debtor/lessor's interest in a lease to have the value of its collateral eliminated through a unilateral *breach of the assignment contract* by the debtor. That result would be unacceptable to both lenders and borrowers.

*Id.* at 1555. (Citations omitted.) (Emphasis added.) *See also Darling Shop of Birmingham v. Nelson Realty Co.,* 262 Ala. 495, 79 So.2d 793 (1954).

While in the instant case there was not a formal assignment of the lease and rents of the Debtor as there was in *Woolworth,* there was a security interest given to the Partnership through the Security Agreement of June 24, 1986. Further, as in *Woolworth,* there was a contract between the Debtor and the Partnership by virtue of the Security Agreement in which the Debtor agreed not to transfer the lease or rents without the consent of the Partnership. The Debtor unilaterally breached this contract by amending its lease with the Restaurant to allow the crediting of rents against the loan debt. The amendment of the lease not only breached the contract between the parties, but arguably served to convert the security interests of both the Partnership and Altus in the lease and rents. The Court finds, as in *Woolworth,*

the lease amendment is invalid and of no effect.

Having ruled the lease amendment ineffective, the Court must determine how this affects the plea of recoupment. The availability of recoupment would not necessarily depend on a written agreement authorizing it if the requisite elements otherwise existed. In this case, it is the amended lease which forms the only nexus between the loan indebtedness and the rent indebtedness. This nexus is necessary to show the two claims arose from the same transaction. Since the Court has declared invalid this addendum, the plea of recoupment necessarily fails.

## II. SETOFF OF POSTPETITION RENTS

■ The Restaurant's alternate argument is that it is entitled to retain the rents it has withheld on the basis of setoff pursuant to Section 553 of the Bankruptcy Code. This section allows setoff to proceed with certain restrictions. 11 U.S.C. § 553. It is accepted that Section 553 does not "create any new right of setoff when none exists under nonbankruptcy law. It merely recognizes the existence of the doctrine of setoff, and adds some additional restrictions to its application." 4 *Collier on Bankruptcy* 553.02 (15th Ed.1988). Therefore, as long as Alabama law recognizes setoff, it is also available in bankruptcy under the guidelines of Section 553.

Setoff is in fact a recognized type of cross-action in Alabama. *Carolina Portland Cement Co. v. Alabama Construction Co.,* 162 Ala. 380, 50 So. 332 (1909). In contrast to recoupment, a setoff may be a separate and independent demand, not connected with the original cause of action. *Troy Laundry Machine Co. v. Joyce,* 229 Ala. 331, 157 So. 214 (1934). Therefore, to the extent the Restaurant is defending a rent turnover action by the Debtor, setoff may be pleaded for the loan indebtedness even though the claims stem from separate transactions.

While the Restaurant's desired setoff is not affected by the hurdle which defeated the recoupment argument, there is a further requirement for setoff under Alabama law which hinders the Restaurant. Debts to be setoff against each other must be "mutual"; they must be due to and from the same persons in the same capacity. *First National Bank of Abbeville v. Capps,* 208 Ala. 207, 94 So. 109 (1922). Thus, in a suit by a landlord against a sheriff to recover funds collected on a judgment against a tenant, the sheriff could not setoff against the judgment due the landlord a debt the landlord owed to the tenant, a third party. *Thompson v. Merriman,* 15 Ala. 166 (1849).

It is established that upon the filing of a Chapter 11 bankruptcy petition, the prepetition debtor becomes a debtor-in-possession, a new legal entity. *In re Mammoth Mart, Inc.,* 536 F.2d 950, 954 (1st Cir.1976). To the extent the Restaurant wants to setoff rents that became due postpetition to the debtor-in-possession, there would be no mutuality of the parties as required under Alabama law. *Standard Oil Co. of New Jersey v. Elliot,* 80 F.2d 158 (4th Cir.1935).[1]

While it may be argued the Restaurant became liable for the rents before the bankruptcy by virtue of the prepetition lease, and therefore is setting off after filing a debt owed to the prepetition debtor, this argument fails. It has been held under similar circumstances that rent to be earned and to accrue postpetition could not be setoff due to a lack of mutuality, in spite of the fact that the lease was entered into prepetition. *In re J.A.G., Inc.,* 7 B.R. 624 (Bankr.D.Mass.1980).

Therefore, under the mutuality doctrine of Alabama setoff law, and without reaching Section 553, the Court holds to the extent the Restaurant is holding rents withheld postpetition, no setoff of these amounts is allowed. The Court's interlocutory Order of November 14, 1988, directed these funds be turned over to the Debtor.

---

**1.** The mutuality requirement is found not only in the law of Alabama, but is also codified in Section 553 of the Bankruptcy Code. Even if state law allowed setoff without mutuality, the hurdle would have to be cleared under federal law. 11 U.S.C. § 553(a).

## III. SETOFF OF PREPETITION RENTS

The Court now turns its attention to the setoff of the prepetition rents withheld. Again, the mutuality doctrine of Alabama law comes into play. Even if the rent withheld became due before the Debtor became a debtor-in-possession, do the parties have mutuality? After all, the Debtor owes indebtedness to the McMaths, and the Restaurant is offsetting that debt against the rent it owes to the Debtor. There would appear to be three parties involved herein, as in *Thompson, supra,* thereby defeating the mutuality requirement.

While the McMaths and the Restaurant are separate parties, however, the McMaths are unconditional guarantors on the Restaurant's lease with the Debtor. The Debtor had the option of obtaining the rent payments from either the McMaths or the Restaurant. *Union Indemnity Co. v. Goodman,* 225 Ala. 499, 144 So. 108 (1932). Therefore, what appears to be a nonmutual setoff is actually an offset of rents owed by the McMaths to the Debtor against a loan debt owed by the Debtor to the McMaths. Because of the unconditional guarantee, the mutuality requirement is satisfied. *In re Chestnut Co., Inc.,* 39 B.R. 519 (Bankr.D.S.C.1984).

Mutuality notwithstanding, having determined the Partnership holds a valid security interest in the rents and leases of the Debtor, can the Restaurant effect a valid setoff of the Partnership collateral? In *In re Concrete Structures, Inc.,* 23 B.R. 605 (Bankr.E.D.Va.1982), it was held a bank's perfected security interest in accounts receivable did not defeat the right of setoff by a party owing such an account. The Court noted an assignee of rights under a contract stands in the shoes of the assignor and has no greater rights against the account debtor than did the assignor. *Id.* at 614. The Court based its decision in part on language in the Maryland Commercial Code which holds that "the rights of an assignee are subject to ... [a]ll the terms of the contract between the account debtor and the assignor and any *defense or claim arising therefrom." Id.* (citing Md.Code Ann., 9–318(1)(a) (Emphasis added.))

Alabama law is analogous to that of Maryland, which was construed in *Concrete Structures.* One early case reads as follows:

> Ordinarily, an assignee acquires the same rights, no greater and no less, than those possessed by the assignor, and which, by the assignment, the latter has conveyed to the former. In fact, it is generally held that the assignee simply steps into the shoes of the assignor.

*Upchurch v. West,* 234 Ala. 604, 176 So. 186 (1937). Further, this principle has been codified in the Code of Alabama with wording identical to that used in the Maryland Code, *supra.* Code of Alabama 1975, 7–9–318. Applying this to the present case, the Partnership's rights in the rents and leases is not senior in priority to any setoff defense the Restaurant may assert. At best the Partnership merely steps into the shoes of the Debtor with regard to the setoff claim.

Based on the foregoing, the Court concludes the Restaurant is entitled to a setoff under Alabama law for the prepetition rents withheld. Bankruptcy having intervened, however, the extent to which setoff will be allowed is governed by Section 553 of the Bankruptcy Code.

## IV. APPLICATION OF SECTION 553

As previously stated, Section 553 of the Code allows setoff to proceed in spite of bankruptcy with three exceptions not relevant here.[2] Subsection (b), however, limits the amount which can be offset within 90 days of the filing of bankruptcy. It has been explained as follows:

> Under Section 553(b), prepetition setoffs during the 90 days before filing that work an improvement in the offsetting creditor's position are recoverable by the

---

**2.** Subsection (a) provides a creditor may not exercise setoff if: 1) the creditor's claim against the debtor is disallowed; 2) the creditor's claim against the debtor was transferred to the creditor by a third party during the 90 days before bankruptcy; or 3) the debt owed to the debtor by the creditor was incurred during the 90 days before bankruptcy for the purpose of obtaining a setoff. 11 U.S.C. § 553(a).

trustee to the extent of the improvement. Thus when a creditor sets off during that period, and by so doing improves its position over what it could have accomplished by exercising its setoff rights on the first date on which there was an insufficiency during the period, the increase in its insufficiency vis a vis the debtor may be recovered, but may not exceed the amount setoff.

4 *Collier on Bankruptcy,* 553.08 (15th Ed. 1988). Thus, to the extent the Restaurant improved its position through setoffs, over its position on the date of the first insufficiency, then setoff will not be allowed.

The Debtor's indebtedness to the Restaurant became due on July 13, 1988. The first date thereafter when the Debtor had a claim against the Restaurant was July 15, 1988, when the Restaurant owed the Debtor rents in the amount of $8,817.86. At that time, the Debtor owed the Restaurant $101,753.60. The insufficiency (as defined in Section 553(b)(2)), therefore, on the first date during the 90 days prior to bankruptcy on which there was an insufficiency was $92,935.74.

The Restaurant accomplished four setoffs prepetition, beginning on July 15, 1988, and ending on September 1, 1988. On September 1, 1988, the date of the last setoff, the total amount of rents withheld was $43,726.41. On September 7, 1988, the closest date to September 1, 1988, for which an amount is available, the claim of the Restaurant against the Debtor was $103,233.20. The insufficiency, therefore, on the date of the setoff was $59,506.79.

Applying the formula found in Section 553(b), the difference between the two insufficiencies amounts to $33,428.95. This is the amount by which the Restaurant improperly improved its position during the 90 days preceding bankruptcy. This amount, then, is recoverable by the Debtor, while the Restaurant may retain $10,297.46 of the rents withheld as an allowable setoff.

### V. REPAIRS

■ The final assertion of the Restaurant is it's entitlement to a setoff of $3,384.61 representing amounts expended in repairing and improving the leased premises. The Restaurant seeks reimbursement in the following amounts for the designated repairs: 1) $332.75—roof repair; 2) $353.25—roof repair; 3) $50.00—parking lot repair; 4) $234.86—sign repair. The following amounts were spent on improvements to the leased premises: 1) $218.10—installation of parking lot lighting; 2) $1,895.65—purchase and installation of air conditioning. There is also a claim for $300.00 paid on a water bill.

The lease between the Restaurant and the Debtor provides as follows in regard to repairs:

8. *Repairs.* Landlord will maintain the exterior of the premises, the roof, halls for ingress and egress, elevators, parking lots and signs and will make necessary repairs to the same ... Landlord shall have no liability to Tenant for the failure of the plumbing, electrical, heating and air conditioning systems or for repair and maintenance of the same ... Except for items set forth herein to be maintained and repaired by Landlord, Tenant agrees to keep the premises clean and to repair or replace all other portions of the leased premises.

Petitioner's Exhibit 1. Lease dated May 21, 1985. It would appear the specific terms of the lease itself obligate the Debtor for the roof, parking lot and sign repairs. The issue, however, is whether proper notice was given to the Debtor prior to the Restaurant's incurring the repair costs.

Where an agreement is made between a landlord and tenant which provides the landlord will perform certain repairs, notice by the tenant to the landlord of the need for the repairs is required before the landlord can be held in default. *Chambers v. Lindsey,* 171 Ala. 158, 55 So. 150 (1911). Similarly, the Court concludes notice to the Debtor would be required, affording an opportunity for the Debtor to perform the repairs, before the Restaurant could contract out the work and seek reimbursement from the Debtor.

There is little evidence before the Court as to the notice given to the Debtor regarding the needed repairs. Dale McMath, President of the Restaurant, testified there was definitely no notice given prior to either the parking lot repair or the second roof repair of $353.25. There is no evidence as to whether notice was given prior to the repair of the sign. As to the first roof repair, McMath's testimony was unclear but indicated only that "we [McMath and the Debtor] talked about it" prior to having the repair performed.

On the basis of the evidence before it, the Court concludes that insufficient notice was given to the Debtor to obligate it for the repairs for which reimbursement is sought. These claims are due to be denied. Additionally, since there is no evidence before the Court as to the water bill claim, reimbursement for this amount is also due to be denied.

The remaining claims for reimbursement are those constituting improvements to the lease property by virtue of the installation of parking lot lighting and air conditioning. McMath testified the lighting was installed without notice to or agreement of the Debtor. The air conditioning, however, was purchased and installed, according to McMath, pursuant to an agreement with the Debtor. The agreement contemplated a reimbursement to McMath of one-half of the total cost of the air conditioning unit. This one-half amount is the $1,895.65 now claimed by the Restaurant.

The Court finds no reimbursement is due the Restaurant for the installation of the parking lot lighting. The Restaurant, however, is due a reimbursement in the amount of $1,895.65 for the air conditioning installation for which it paid.

Based on the foregoing, the Court finds of all the claims for reimbursement, only the air conditioning claim of $1,895.65 is due to be allowed. This having been determined, the issue is whether the amount can be satisfied by recoupment from the pre-petition rents withheld. Based on the analysis of the doctrine of recoupment above, the Court finds that the subject claim is a proper one for recoupment. As previously discussed, there is mutuality of the parties, and in this instance, the mutual claims arise from the same transaction, i.e., the lease agreement. The Restaurant will be allowed to retain from the funds representing withheld prepetition rents an additional amount of $1,895.65 constituting an allowed recoupment.[3]

## ORDER

Now, therefore, it is ORDERED, ADJUDGED and DECREED the Motion for Relief from the Stay filed by Perdido Pass Restaurant, Inc., is GRANTED to the extent it may setoff pursuant to 11 U.S.C. § 553 the amount of $10,297.46 in withheld prepetition rents against the indebtedness owed to it by the Debtor; and it is further

ORDERED, ADJUDGED and DECREED that the Motion for Relief from the Stay by Perdido Pass Restaurant, Inc., is GRANTED to the extent it is allowed an additional $1,895.65 in withheld prepetition rents as a recoupment for the cost of air conditioning installation; and it is further

ORDERED, ADJUDGED and DECREED that the Motion for Relief from the Stay filed by Perdido Pass, Inc., is DENIED as to all other funds in issue; and it is further

ORDERED, ADJUDGED and DECREED that the request of the Debtor for a turnover of all rents withheld is GRANTED to the extent of $31,533.30, the total amount of withheld prepetition rents minus the allowed setoff and recoupment; and it is further

ORDERED, ADJUDGED and DECREED that Perdido Pass Restaurant, Inc. shall pay all future rents due under the lease dated May 21, 1985, to the Debtor; and it is further

3. While a recoupment of funds during the 90 days preceding the filing of a bankruptcy petition could be viewed by some as a preference, this is not the case. Because recoupment is by definition a defense to a claim rather than a mutual obligation, setoff by recoupment is not a preferential payment. *In re California Canners and Growers,* 62 B.R. 18 (Bankr. 9th Cir.1986).

ORDERED, ADJUDGED and DE-CREED that the turnover requested of the Debtor is DENIED as to all other funds in issue; and it is further

ORDERED, ADJUDGED and DE-CREED that the Clerk of the Bankruptcy Court shall pay over to Perdido Pass Restaurant, Inc., the amount of $12,193.11, and shall pay over jointly to the Debtor and Altus Bank the amount of $31,533.30.