JAMES TALCOTT, INC., A CORPORATION OF NEW YORK, AS ASSIGNEE OF REMCO INDUSTRIES, INC., PLAINTIFF-RESPONDENT, v. H. CORENZWIT AND COMPANY, A CORPORATE BODY, DEFENDANT-APPELLANT.

Argued January 23, 1978—Decided May 15, 1978.

Mr. *James M. Cutler* argued the cause for appellant (**Mr. Cyrus J. Bloom,** attorney). ·

Mr. *Alan D. Wiener* argued the cause for respondent (*Messrs. Raff and Scheider,* attorneys).

The opinion of the court was delivered by

SCHREIBER, J. The plaintiff James Talcott, Inc., assignee of a book account arising out of sales of toys by Remco Industries, Inc. (Remco) to the defendant H. Corenzwit & Co., instituted this action to collect the balance due of $36,000. The factual and legal issues centered about a provision in the terms of the purchase agreement to the effect that Remco guaranteed that there would be no drop in prices of the type of merchandise sold to the defendant for a period of 12 months. Talcott, having obtained the Remco inventory upon a default in its borrowing arrangement, sold toys at prices below the Remco guarantee. The defendant asserted that these sales violated the purchase agreement and that breach of the guarantee entitled it to a set-off against the balance due on the account receivable. Holding that the purchase agreement required Remco to reimburse the defendant "for total gross purchases retroactive to time of [its] first purchase" during the 12-month period prior to the date of violation, the trial court found that the total gross sales in that period exceeded the $36,000 and entered judgment for the defendant. The Appellate Division reversed. It reasoned that the drop-in-price provision was not triggered because the plaintiff Talcott had no contractual relationship with the defendant and it, Talcott, not Remco, sold the merchandise. We granted certification. 75 *N. J.* 19 (1977).

At the trial the parties stipulated that the amount of the account receivable was $36,000, that the indebtedness arose out of the sales of toys sold and delivered by Remco to the

defendant, and that all sales were governed by the terms prescribed in the defendant's purchase order.

The defendant, one of the five largest toy distributors in the United States, had been purchasing toys from Remco, a toy manufacturer, since at least 1966. The defendant's purchase order forms were used and accepted by both parties for each order. The orders contained the following pertinent provisions:

> The acceptance and Shipment of this order is the Vendor's certification that the prices, discounts and the terms of the resulting invoice, or invoices, covering the sale are the same that are granted any other customer of similar classification for the same quantity, make, type, quality and grade of merchandise under like circumstances.
>
> *   *   *   *   *   *   *   *
>
> If price is omitted on order, it is agreed that Vendor's price will be the lowest prevailing market price and in no event is the order to be filled at higher prices than last previously quoted or charged without Purchaser's written consent.
>
> *   *   *   *   *   *   *   *
>
> Vendor guarantees cost of merchandise against drop in price for 12 months from date of shipment. He agrees to reimburse purchaser for total gross purchases retroactive to time of first purchase for such decrease at once.

Because of the volatile nature of the toy business, the defendant deemed it essential to protect itself as a toy distributor against a drop in prices at the wholesale level. Such a provision, the defendant believed, assured the saleability of its inventory and acted as a safety device with respect to the defendant's customers who had received a comparable assurance on their purchases from the defendant.

Between February 1973 and February 1974, defendant had purchased $65,842 worth of merchandise from Remco. At some point during that period Remco decided to go out of business. Attempts to sell its inventory located in the Remco Building in Harrison, New Jersey, at 60 percent of the manufacturer's cost, failed. The inventory was subsequently sold in February 1974 by A. J. Wilner, an auctioneer, on behalf

of plaintiff Talcott. Its interest in the inventory resulted from financial arrangements previously made with Remco. Talcott had advanced funds to Remco and obtained a security interest in Remco's accounts receivable and in Remco's inventory at Harrison, New Jersey. Upon default, Talcott became assignee of the $36,000 accounts receivable owing by the defendant and caused the inventory to be sold. As we previously observed, these sales occurred at prices lower than those fixed in the defendant's purchase orders. As of June 11, 1974 the defendant had on hand $15,150 of those goods. These had not been saleable because of the 'sharp drop in prices occasioned by the Remco distress sale.

■ Plaintiff contends that the drop-in-price clause was not applicable to a distress sale of this type. We do not agree. The contractual language is an outright guarantee that the cost of merchandise will not drop in price for 12 months from date of shipment. There is no intimation that Remco would be relieved of this obligation if some agent, assignee or third person made the sale in its place. The distributor was seeking protection against a wholesale price cut irrespective of the identity of the seller of the toys. Uncontradicted testimony of the defendant's vice-president was that one "reason we put [the clause] on the purchase order is to protect us in case" Remco went out of business, though he had not expected that occurrence. The distress sale of the Remco inventory violated the defendant's agreement and understanding with Remco.

■■ We next turn to whether plaintiff Talcott as assignee of the accounts receivable should be subjected to the defendant's set-off claim, the claim having arisen after the assignment of the accounts receivable became effective. Both parties agree that their respective rights and duties are governed by the Uniform Commercial Code. The Code has continued the common law view that an assignee of a chose in action, such as a receivable, stands in the shoes of the assignor. *N. J. S. A.* 12A:9–318(1); 12A:1–103; *Restatement of Contracts,* § 167(1)(2) (1932); 3 *Williston, Con-*

*tracts*, § 432 at 181–186 (3d ed. 1960). Generally speaking, the assignee at common law was subject to the equities and defenses which the account debtor could have asserted against the assignor prior to the assignment. In *Falkenstern v. Herman Kussy Co.*, 25 *N. J. Misc.* 447 (Sup. Ct. 1947), aff'd 137 *N. J. L.* 200 (E. & A. 1948), the court wrote:

An assignee of a chose in action takes what the assignor had, subject to all set-offs, discounts and defenses which the debtor has, not only against the assignee but also against the assignor before notice of the assignment, [citation omitted] but the assignee does not thereby, without more, assume the liabilities of the assignor. [*Id.* at 202 (quoting from 25 *N. J. Misc.* at 448)]

▆ This proposition has been incorporated in the Code.[1] *N. J. S. A.* 12A:9–318. Section 9–318 provides that the rights of an assignee are subject to claims arising under the contract between the assignor and the account debtor. It reads, in pertinent part:

\* \* \* the rights of an assignee are subject to (a) all the terms of the contract between the account debtor and assignor and any defense or claim arising therefrom \* \* \*. [12A:9–318(1)(a)]

It is clear then that the rights of the assignee of an account receivable are subject to contract defenses or claims of the account debtor arising by virtue of the terms of the contract out of which the receivable was created. *See* Gilmore, "The Assignee of Contract Rights and His Precarious Security," 74 *Yale L. J.* 217, 230 (1964).

It is immaterial whether the contract defenses or claims arose before or after notice of the assignment. This situation is to be differentiated from the one in which the account debtor's defenses are not predicated upon the contract terms. *Cf. N. J. S. A.* 2A:25–1. Where that is so, such defenses

---

[1] It should be noted, however, that *N. J. S. A.* 2:210(4) reverses the presumption, expressed in *Falkenstern*, that an assignment of rights does not include a delegation of duties.

are limited to those which accrue before the account debtor is notified of the assignment. *N. J. S. A.* 12A:9–318(1)(b).

The New Jersey Study Comment to *N. J. S. A.* 12A:9–318(1)(b) points out:

[W]hen the rights of the account debtor arise on the contract between the debtor and the assignor it makes no difference whether those rights accrued before or after notification — such rights may be asserted against the assignee. Where, however, the claims against the assignor arise independently of the contract, which is the subject of the assignment, the assignee takes free of those claims which arise subsequent to notification of the account debtor of the assignment to the assignee.[2]

*Accord Ertel v. Radio Corporation of America,* 261 *Ind.* 573, 307 *N. E.* 2d 471 (Sup. Ct. 1974) ; *Farmers Acceptance Corp. v. DeLozier,* 178 *Colo.* 291, 496 *P.* 2d 1016 (Sup. Ct. 1972) ; *Gateway Nat'l Bank of Chicago v. Saxe, Bacon & Bolan,* 40 *A. D.* 2d 653, 336 *N. Y. S.* 2d 668 (Sup. Ct., App. Div. 1972).

 The drop-in-price clause in the defendant's agreement with Remco was clearly a "term of the contract" and since the liquidation of Remco's inventory at prices below those fixed in the purchase orders constituted a breach of that term, the plaintiff Talcott's claim was subject to the claim arising out of that breach.

---

[2]The Uniform Commercial Code Comment has a comparable statement:

1. Subsection (1) makes no substantial change in prior law. An assignee has traditionally been subject to defenses or set-offs existing before an account debtor is notified of the assignment. When the account debtor's defenses on an assigned account, chattel paper or a contract right arise from the contract between him and the assignor it makes no difference whether the breach giving rise to the defense occurs before or after the account debtor is notified of the assignment (subsection (1) (a)). The account debtor may also have claims against the assignor which arise independently of that contract; an assignee is subject to all such claims which accrue before, and free of all those which accrue after, the account debtor is notified (subsection (1) (b)). * * *. [U. C. C. § 9–318, comment 1]

The purchase order provided that Remco agreed to reimburse the defendant "for total gross purchases retroactive to time of first purchase for such decrease at once." Since the guarantee against a drop in price was for a 12-month period and the distress sales occurred in February 1974, the defendant asserts that it is entitled to a set-off of $65,842, the amount of its purchases between February 1973 and February 1974. The plaintiff contends that such a construction is inequitable because the defendant had sold all the toys except for $15,150.

■ We must ascertain the parties' intention from a consideration of all the surrounding circumstances. *Atlantic Northern Airlines, Inc. v. Schwimmer,* 12 *N. J.* 293 (1953). Did the parties intend that the buyer would receive from the seller an amount equal to the total gross purchases for a 12-month period irrespective of the unsold amount in the buyer's hands? If the buyer had bought and sold all its purchases within a month and 11 months later the seller violated the drop-in-price provision, did the parties intend that the buyer would be entitled to recover an amount equal to the total gross purchases? We believe not. Such a result would constitute a penalty discordant with plaintiff's actual loss due to the drop in price.[3] *Barr & Sons, Inc. v.*

[3]The dissent relies in part on the general assertion that Corenzwit had a similar exposure because of the same drop-in-price clause in its contracts with retailers. However, Corenzwit did not claim or establish that, as a result, it had in fact suffered any losses.

The dissent's approval of the clause in effect constitutes a sanctioning of a liquidated damage provision which is not reasonably related to actual loss. See *Westmount Country Club v. Kameny,* 82 *N. J. Super.* 200 (App. Div. 1964), which held that "[a] provision in a contract * * * which provides that the full contract price is recoverable in the event of a breach — absent evidence that the parties fixed the amount as a reasonable forecast of just compensation for the harm caused by a breach and that such harm is incapable or very difficult of accurate estimation — bears no reasonable relation to actual damages and cannot be considered as liquidated damages." [*Id.* at 207]. See *N. J. S. A.* 12A:2–718(1). The parties

*Cherry Hill Center, Inc.,* 90 *N. J. Super.* 358 (App. Div. 1966). We consider the plaintiff's interpretation of the agreement, namely that "total gross purchases" refers to the total unsold gross purchases, to be consonant with the parties' true understanding. Such a construction is "most equitable" and "will not give one [party] an unfair or unreasonable advantage over the other." 9 *Williston, Contracts,* § 46 at 65 (footnote omitted) (Rev. ed. 1945). *Washington Construction Co., Inc. v. Spinella,* 8 *N. J.* 212 (1951). Justice Oliphant in *Tessmar v. Grosner,* 23 *N. J.* 193 (1957), stated the principle in the following manner:

> Even where the intention is doubtful or obscure, the most fair and reasonable construction, imputing the least hardship on either of the contracting parties, should be adopted, International Signal Co. v. Marconi Telegraph Co. of America, 89 N. J. Eq. 319 (Ch. 1918), affirmed 90 N. J. Eq. 271 (E. & A. 1919), so that neither will have an unfair or unreasonable advantage over the other. [*Id.* at 201]

The judgment is modified and cause remanded for entry of judgment in favor of the plaintiff in the sum of $20,850 plus interest and costs.

CLIFFORD, J., dissenting in part. While I am in complete accord with so much of Justice Schreiber's lucid opinion as holds plaintiff's claim on the book account subject to defendant's set-off arising out of a breach of the drop-in-price agreement with Remco, I see no justification for the Court's substitution of what it perceives to be an equitable measure of damages where the contractual language touching damages is clear — unmistakably so.

The clause in question provides that should there be, within 12 months from the date of shipment, a drop in price of an item purchased by Corenzwit, the latter thereupon becomes

certainly could have reasonably anticipated that the buyer would suffer no loss as to goods sold within the 12-month period before the breach, which goods had, in turn, been sold by the buyer's customers.

entitled to reimbursement "at once" for the "total gross purchases * * *." Defendant made "total gross purchases" from Remco in the amount of $65,842 beginning on February 27, 1973 and ending on September 11, 1973; hence the contractually-protected time period ran from February 27, 1973 to February 26, 1974. Plaintiff, as assignee of Remco, activated the drop-in-price clause when, on February 11, 1974, it sold Remco's inventory at prices substantially below those at which Corenzwit had purchased its goods. The specific guarantee against such price reduction having been breached, Corenzwit thereupon became entitled to reimbursement for its total gross purchases back to February 27, 1973, or $65,842.

Despite the contract language, which could scarcely be clearer on the damage question, the Court chooses to intrude its notion of equity into a sensitive area of commercial practice, thereby limiting defendant's set-off to $15,150. Assuming, as the majority apparently does, that this represents the purchase price only of those toys bought by Corenzwit from Remco within the protected time period which remained unsold at the commencement of the litigation, the Court has thus substituted for the plain and unmistakable contract language of "total gross purchases" something quite different, namely, "total unsold gross purchases." It thereby trespasses on the fundamental proposition that a court will not rewrite a contract in order to create an agreement more to its liking — one which while perhaps "better" than the contract the parties themselves have seen fit to execute, nevertheless varies its terms in an important respect. *E. g., Brower v. Glen Wild Lake Co.,* 86 *N. J. Super.* 341, 346 (App. Div.), certif. den., 44 *N. J.* 399 (1965).

As a general proposition, where the contractual language is facially unambiguous, it seems to me that a court should be most hesitant to reach beyond that language's plain meaning for further evidence of the parties' intention. See, *e. g., New Wrinkle, Inc. v. Armitage & Co.,* 238 *F.* 2d 753, 757 (3d Cir. 1956) (applying New Jersey law); 4 *Willis-*

*ton on Contracts* § 609 at 402 (3d ed. 1961). The majority, however, implies that *Atlantic Northern Airlines, Inc. v. Schwimmer,* 12 *N. J.* 293 (1953), authorizes an excursion beyond the plain language of the contract in order to ascertain the intent of the parties. Reliance on *Schwimmer* is misplaced. That case involved the interpretation of a broadly-worded contract provision which, although semantically unambiguous, became unclear in its application to the facts of the case. Consequently, the *Schwimmer* court of necessity had to look beyond the plain meaning of the language to ascertain the parties' intentions. Here, however, the drop-in-price clause is not only semantically unambiguous but is narrowly tailored to the factual situation before the Court. Hence there is no need to look beyond the contractual language. Nor does the majority "look" to anything outside the contract — it simply rewrites the document.

Even were it appropriate to examine other factors bearing upon the intent of the parties, as the majority suggests is necessary here, it seems to me that the contract language aptly expresses the likely intention of those who signed it. The obvious purpose of the drop-in-price clause was to protect against the disastrous consequences which would be visited upon a distributor should the manufacturer make the product available at a reduced price to other distributors — and they, in turn, to retailers who might be customers of this distributor or competitors of those customers. Although this purpose alone supports the view that the plain language of the clause reflects the intent of the parties, further support may be derived from the potential liability faced by Corenzwit to its "downstream" buyers. More specifically, the contracts with those buyers contain the same protective drop-in-price clause as is involved in the instant case. In light of the potential liability which Corenzwit would face as a result of Remco's "dumping" of the items in question, at the time of the execution of the contract these experienced commercial parties clearly intended that the drop-in-price clause should guarantee total gross purchases.

The majority concludes, however, that regardless of any intention of the parties to permit Corenzwit to recover an amount equal to the total gross purchases, the clause as interpreted herein constitutes an unenforceable penalty. It reasons that awarding Corenzwit a set-off equal to the amount of total gross purchases "in effect constitutes a sanctioning of a liquidated damage provision which is not reasonably related to actual loss." *Ante* n. 3 at 312. But the very case relied upon by the majority and from which it extracts a significant quotation supports the view that the drop-in-price clause is *not* an unenforceable penalty. *Westmount Country Club v. Kameny*, 82 *N. J. Super.* 200, 207 (App. Div. 1964), instructs us that "[a] provision in a contract * * * which provides that the full contract price is recoverable in the event of a breach — *absent evidence that the parties fixed the amount as a reasonable forecast of just compensation for the harm caused by a breach and that such harm is incapable or very difficult of accurate estimation* — bears no reasonable relation to actual damages and cannot be considered as liquidated damages." [Emphasis added]. See *N. J. S. A.* 12A:2–718(1) (common law view adopted by the New Jersey codification of the Uniform Commercial Code). The emphasized portion of the quote fits snugly into this case. The estimation of damages resulting from any breach of the drop-in-price clause can hardly be viewed as unreasonable, particularly when examined as of the time the contract between Remco and Corenzwit was executed; and no accurate estimation of the actual damages could be made at that time, given the speculative nature and extent of any liability that might be incurred.

One need look no further than *D. H. M. Industries v. Central Port Warehouses, Inc.*, 127 *N. J. Super.* 499 (App. Div. 1973), aff'd o. b., 64 *N. J.* 548 (1974), for the proposition that the clause as interpreted herein does not represent an unenforceable penalty. There the question presented was whether a security deposit provision in a large commercial lease was intended to serve as liquidated damages in the

event of a breach by the tenant. The Appellate Division looked to (1) the intent of the parties, (2) whether the extent of damages would be difficult to evaluate if a breach were found to have occurred, and (3) "whether the amount posted as security represented a good faith effort to estimate in advance the foreseeable and probable loss which might ensue from a breach." 127 *N. J. Super.* at 503. In concluding that the clause in question constituted an enforceable liquidated damage claim, the court pointed out that

[t]he modern tendency of the courts has been to look with favor upon provisions in agreements which fix specified amounts as damages in the event of a breach, preferring to consider them as liquidated damage clauses rather than penalties. 22 *Am. Jur.* 2d, *Damages*, § 214, p. 301 (1965) ; *Williston, Contracts*, 3d ed. § 214. As indicated in *Priebe & Sons v. United States*, 332 *U. S.* 407, 68 *S. Ct.* 123, 92 *L. Ed.* 32, 109 Ct. Cl. 870 (1947)

Today the law does not look with disfavor upon "liquidated damages" provisions in contracts. When they are fair and reasonable attempts to fix just compensation for anticipated loss caused by breach of contract, they are enforced. (citations omitted) They serve a particularly useful function when damages are uncertain in nature or amount or are unmeasurable, as is the case in many government contracts. (citations omitted) *And the fact that the damages suffered are shown to be less than the damages contracted for is not fatal. These provisions are to be judged as of the time of making the contract.* (at pp. 411–412, 68 *S. Ct.* at 126).

[127 *N. J. Super.* at 503–04 (emphasis added).]

The reasons cautioning restraint in disregarding, under the guise of equity, the carefully selected language of the parties to a contract were aptly set forth by Justice Wachenfeld twenty years ago. They still apply.

"Hard cases make bad law." Nevertheless the majority refuses to uphold the contract as written and grants the relief it thinks is equitable under the circumstances, thus creating for the plaintiff a new contract foreign to the one agreed to by the parties.

If written contracts are not to be upheld as written, then contractual rights and obligations will never be stabilized and certain and the business and financial world will face chaos. Every party who makes an agreement which subsequently proves to be econom-

ically undesirable can still hope to receive judicial relief upon the theory that the unexpected development was not within the contemplation of the parties at the signing of the agreement.

The solemnity of a written contract, the cornerstone of our commercial law, is thereby jeopardized and partially destroyed. The majority has, in my view, ventured beyond the grounds of "interpretation" or "construction" and into the realm of "creation" and "substitution."

> [*Crewe Corp. v. Feiler*, 28 *N. J.*
> 316, 330–31 (1958) (Wachenfeld,
> J., dissenting).]

Apart from the sanctity which ought to be accorded a contract freely arrived at, there are other persuasive reasons counseling against meddling with this agreement. First, the parties before us (including plaintiff's assignor, Remco) quite plainly are anything but babes in the commercial woods. The record gives no indication that any of them was unaware of what it was doing, nor is there any discernible need for a court's protection of and indulgence towards some innocent and unwary party to these transactions. And as has already been pointed out, while Corenzwit has succeeded in selling approximately eighty per cent of the goods purchased from Remco, it remains subject to claims by its retail customers based on the same drop-in-price clause in its contracts with them, and the applicable statute of limitations has not yet run on these potential claims. So far as the record discloses, the drop-in-price provision is one not uncommon in the toy manufacturing business or, for that matter, other enterprises where distributors seek to discourage competitors' price slashing by prohibiting manufacturers from undercutting the market.

I would reverse and remand to the trial court for entry there of judgment for defendant.

Hughes, C. J., joins in this opinion.

*For modification and remandment*—Justices Sullivan, Pashman, Schreiber and Handler and Judge Conford—5.

*For reversal and remandment*—Chief Justice Hughes and Justice Clifford—2.