[No. F005950. Fifth Dist. Jan. 5, 1988.]

PRODUCERS COTTON OIL COMPANY, Plaintiff and Respondent, v.
AMSTAR CORPORATION, Defendant and Appellant.

640

COUNSEL

Thomas, Snell, Jamison, Russell & Asperger, Steven M. McClean and David M. Gilmore for Defendant and Appellant.

McCormick, Barstow, Sheppard, Wayte & Carruth, Oliver W. Wanger and Timothy Jones for Plaintiff and Respondent.

OPINION

STONE (W. A.), J.*—

## STATEMENT OF THE CASE

Appellant, Amstar Corporation (Amstar), appeals from a money judgment rendered against it in an action for conversion of crop proceeds. The case presents a number of novel issues in California involving the interplay

---

* Assigned by the Chairperson of the Judicial Council.

of sections 9306, 9307 and 9318 of the California Uniform Commercial Code.[1]

We are called upon to determine two main issues. The first is whether a secured creditor's implied authorization of sale of collateral relinquishes the creditor's security interest in collateral proceeds. We hold that the creditor's security interest in the proceeds continues where the creditor does not waive its interest by conduct or by the language of the sales contract.

The second issue is whether a claim based upon equitable principles of unjust enrichment can, in certain circumstances, supersede the rights of a secured creditor whose interest is fully perfected. We hold that such an equitable claim prevails in this case.

STATEMENT OF THE FACTS

Producers Cotton Oil Company (Producers) financed Cecil Borboa's farm operations for crop years 1976 through 1981. It was Producers's practice to take a security interest in all crops that it financed and send a notice to the crop buyers informing them of that interest. The notice reserved Producers's security interest in each crop and its proceeds. The assignment stated that no setoff or deductions were to be made by the buyer.

Producers loaned Borboa $2,042,710.28 for his various farming operations and received a promissory note dated January 13, 1981. Borboa also signed a security agreement and financing statement in Producers's favor which covered all his crops and the proceeds therefrom. The financing statement was duly filed, and the parties agree that Producers had a perfected security interest before any crop sale.

The terms of the security agreement required Borboa to obtain written consent from Producers to sell his sugar beets. However, in 1979, 1980 and 1981 Borboa contracted to sell his beets to Amstar without written authority from Producers. Borboa dealt with Frank Hunt, a field man for Spreckles Sugar Division of Amstar. Hunt knew that Producers financed Borboa, and he assumed Producers held a security interest in Borboa's crops.

Borboa informed William O'Hare, Producers's gin manager, he had agreed to sell his beets to Amstar and gave copies of the sales contracts to O'Hare. The contracts stated, and both Borboa and O'Hare were aware, Amstar would deduct from the sales price amounts for seed, dirt haul, curly

---

[1] All references are to the California Uniform Commercial Code unless otherwise noted.

top virus assessment and California Beet Growers Association dues. Harvesting costs were not specified as deductions.

When O'Hare was informed of the crop sale, he sent Producers's assignment of crop proceeds to Amstar. Amstar responded by attaching a conditional acceptance, the condition being that Amstar would honor the assignment subject to deductions for indebtedness of the grower, and returned it to Producers. Producers did not respond to the assignment modification, either by acceptance or rejection.

In 1979 and 1980, Borboa hired O. L. Williams to harvest his sugar beet crop. Williams billed Borboa, and Borboa presented the bills to Producers for payment. A portion of the 1980 bill in the amount of $10,000 was not paid, however, because of insufficient funds. O'Hare told Borboa he would try to pay the bill in 1981 out of 1981 crop proceeds.

Since Williams was not paid in full for the 1980 harvest, he wanted assurance of payment for 1981. Borboa agreed with Williams the cost of the 1981 harvest as well as the $10,000 unpaid from the 1980 harvest would be paid from the income of the 1981 crops. On October 13, 1981, Borboa requested Amstar pay Williams. Amstar told Borboa it would pay Williams if Producers agreed to that arrangement. Borboa never spoke with anyone at Producers regarding the payment to Williams. However, O'Hare was in the field during harvest time and knew Williams was performing harvesting services. He neither inquired about nor objected to the operation.

Amstar's usual procedure when a grower made such a request was to obtain a subordination from the entity which had the assignment of proceeds. Normally money would not be paid to another party until a signed subordination agreement was received from the secured party. Amstar employees Norman Rianda, the agricultural superintendent, and Michael Bozzini, the agricultural accounts manager, knew Amstar would require a subordination agreement from Producers before Amstar could pay Williams. Bozzini sent a subordination request to Producers but, inadvertently, a copy of the request was not filed in Amstar's grower ledger to notify others that a request had been sent out.

Usually, Producers funneled subordination requests to O'Hare, to be forwarded to the main office. O'Hare did not recall receiving the subordination request from Amstar, but Mr. Veaco, Producers's corporate secretary, testified Producers had received the request and placed it in Borboa's file without making a response. Producers generally denied requests for subordination.

After Amstar sent out the subordination request, Mr. Cushin, a clerical level employee of Amstar, sent a check for $80,600 to Williams on October 30, 1981. The check was paid from net beet credits which had been earned by Borboa's delivery of beets to Amstar to that date. Amstar admitted releasing the check was a "complete breach" of its normal policies and practice because it had notice of the assignment to Producers and had not obtained a subordination.

Because Amstar had paid for harvesting, Borboa did not present a bill for that cost to Producers in 1981. O'Hare took no action to determine why no bill was sent despite the fact previous years' harvest bills had been paid by Producers because Borboa was a "very resourceful person" and could find ways to get work done. At harvest time, O'Hare had projected that Borboa's crop revenues would not be sufficient to repay the loan.

In January 1982, supervisory personnel at Amstar discovered Williams had been paid from crop proceeds. Amstar requested Williams submit harvest bills and return payment in excess of the actual cost of harvesting and hauling. Williams submitted a bill for $53,336.35, including $43,336.35 for harvesting the 1981 crop and $10,000 still owing for the 1980 harvest. Williams returned $27,263.65, the difference between his bill and the $80,600 he was paid in October.

Borboa's 1981 sugar beet crop yielded proceeds of $231,108.76. Amstar remitted $166,019.38 to Producers after deducting $5,129.24 for beet seed, $6,623.49 for "standard deductions" and $53,336.65 for harvesting expenses paid to Williams. In spring 1982 Producers demanded Amstar pay the amounts deducted from the 1981 crop proceeds. Amstar refused.

Producers brought an action against Amstar claiming the deductions violated its security interest and constituted conversion of the proceeds. The court concluded Amstar converted Producers's proceeds to the extent it withheld sums paid to Williams, and Amstar was not entitled to offset those expenses on an unjust enrichment theory.

I

*Producers's Authorization of Sale of Collateral Did Not Affect Its Security Interest in Sale Proceeds—Section 9306*

A. *Producers Authorized the Sale of the Sugar Beet Crop.*

█ The security agreement protecting Producers's interest in the collateral provides the standard prohibition against sale without written consent,

by providing in paragraph 3: "That the collateral shall not . . . be sold . . . without the prior written consent of the secured party . . . ."

Section 9306, subdivision (2) states, except where the code provides otherwise, ". . . a security interest continues in collateral notwithstanding sale, exchange or other disposition thereof *unless the disposition was authorized by the secured party in the security agreement or otherwise,* and also continues in any identifiable proceeds including collections received by the debtor." (Italics added.)

This court held in *Central Cal. Equip. Co.* v. *Dolk Tractor Co.* (1978) 78 Cal.App.3d 855 [144 Cal.Rptr. 367] that in the face of a security agreement which prohibits sale of collateral without written consent, evidence sufficient to sustain a finding of implied consent under the "or otherwise" language of section 9306, subdivision (2) must be clear and be based on prior conduct.

". . . [W]hen a security agreement expressly prohibits the disposition of collateral without the written consent of the secured party, in order for a court to find an authorization permitting disposition free of the security interest within the meaning of section 9306, subdivision (2), there must either be actual prior or subsequent consent in writing by the secured creditor manifesting a purpose to authorize the disposition free of the security interest. Mere acquiescence is insufficient. While we interpret 'or otherwise' in section 9306, subdivision (2), to permit an implied agreement, we believe that such an implied agreement should be found with extreme hesitancy and should generally be limited to the situation of a prior course of dealing with the debtor permitting disposition. The issue is a question of fact, but the trial court should carefully consider the written prohibition against disposition found in the security agreement as an important factor in the factual determination and should determine the matter in favor of the written prohibition unless such conclusion is unreasonable under the circumstances . . . ." (*Id.* at p. 862.)

The trial court determined Producers impliedly authorized the crop sale by the prior dealing between it and Borboa and by its past conduct in failing to require written consent. Borboa sold his sugar beets for crop years 1979, 1980 and 1981 to Amstar without the written consent of Producers. Producers's Mr. O'Hare was aware of the sales and received copies of the sales contracts from Borboa. O'Hare never required Borboa to obtain written consent to sell his sugar beets or any of his crops, other than cotton, nor did he ever object to the crop sales. The parties' course of dealing established that Producers acquiesced to and impliedly authorized the 1981 crop sale to

Amstar. The court's findings on this issue are well supported by the evidence.

■ The sufficiency of the evidence to support a finding is reviewed under the substantial evidence test. The trial court's decision is sustained if any substantial evidence supports the judgment. (*Ellison* v. *Ventura Port District* (1978) 80 Cal.App.3d 574, 581 [145 Cal.Rptr. 665].) The appellate court must accept as true all evidence tending to establish the correctness of the finding made, taking into account, as well, all reasonable inferences which lead to the same conclusion, and resolving all conflicts in favor of the finding. (*In re Marriage of Mix* (1975) 14 Cal.3d 604, 614 [122 Cal.Rptr. 79, 536 P.2d 479].)

B. *Producers Relinquished Its Security Interest in the Sugar Beet Crop.*

■ Because Producers impliedly authorized the sale of the sugar beets by Borboa to Amstar, Producers lost its security interest in the specific collateral. Section 9306, subdivision (2) provides a security interest continues in collateral notwithstanding sale "unless the disposition was authorized by the secured party in the security agreement or otherwise."

Since we have determined that Producers, by its past conduct, authorized the sale, it necessarily follows that Producers lost its lien on the collateral upon completion of the sale to Amstar.

C. *The Monies Paid to Williams by Amstar Were a Portion of the "Proceeds" of the Sugar Beet Sale.*

■ Critical to a discussion of the issues raised by Amstar is a determination whether the $53,336.35 paid by Amstar to Williams constituted proceeds of the sugar beet sale, as defined in section 9306, subdivision (1), which reads: " 'Proceeds' includes whatever is received upon the sale . . . of collateral . . . ."

Amstar contends that the key word is "received," and since Borboa did not receive these particular funds, they were not proceeds.

Two lines of cases appear to have developed on this issue, one holding that "proceeds" means proceeds in the hands of the debtor, the other holding that "proceeds" includes an account arising when the right to payment accrues.

In support of its contention, Amstar cites *Terra Western Corp.* v. *Berry & Co.* (1980) 207 Neb. 28 [295 N.W.2d 693]; *First Interstate Bank* v. *Arizona*

*Agrochemical* (Colo.App. 1986) 731 P.2d 746; and *Graves Equipment, Inc.* v. *M. DeMatteo Const.* (1986) 397 Mass. 110 [489 N.E.2d 1010]. While none of these authorities is directly on point, a brief review of each is helpful.

In *Terra Western Corp.* v. *Berry & Co., supra,* 207 Neb. 28, one Temme executed a crop note and security agreement to Farmers Agricultural Credit Corporation, which later assigned the note to Terra. The collateral included all crops as well as proceeds of sale, exchange or disposition of the crops. In addition, Temme agreed to keep the crops insured, which he did by contract of insurance with Alliance. The crop was destroyed by hail, and Alliance paid Temme's claim. Terra sued Alliance and Berry, its agent, for conversion. The case was decided on the pleadings. There was no allegation that the contract of insurance between Temme and Alliance contained a loss payable clause in favor of Terra, no allegation that Alliance or Berry had actual notice of Terra's crop lien, and no allegation that Alliance paid the claim with knowledge of Temme's contractual agreement to insure the crops.

With these circumstances the court notes, under pre-Uniform Commercial Code law, the insurer has no liability to the lienholder once the claim has been paid. Prior to payment of the claim the lienholder has an equitable action to impress its lien upon the proceeds. The question before the court was whether Nebraska's version of Uniform Commercial Code section 9-306 changed this result. It held section 9-306, subdivision (1) requires the proceeds to be received by the mortgagor before the lien attaches. The insurer does not receive the proceeds; it pays money which becomes proceeds when received by the owner.

*First Interstate Bank* v. *Arizona Agrochemical, supra,* 731 P.2d 746, is perhaps closest factually to the case under consideration. Baumgardner, a farmer, obtained financing from the bank and gave as collateral his crops and equipment, in which the bank had a perfected security interest. Agrochemical, a creditor of Baumgardner, obtained judgment against him and recorded its lien against the debtor's town home. Thereafter, the bank obtained judgment against Baumgardner.

Without the bank's consent, Baumgardner sold some of his encumbered farm equipment, for which he was paid cash. With that cash he paid off Agrochemical and received a satisfaction of judgment. When the bank learned of the sale of equipment and payoff, it required Baumgardner to record his satisfaction of judgment and took a deed to the town home. The bank then sued Agrochemical to recover the proceeds it received from Baumgardner which he received from the sale of collateral.

The court held for Agrochemical. In framing the question to be decided, it said: "At issue here is whether the phrase 'received by the debtor' in § 4-9-306(2) modifies only the phrase 'including collections' or if it modifies the phrase 'identifiable proceeds' as well. If it modifies identifiable proceeds, also at issue is whether the security interest continues in identifiable proceeds received by the debtor once the proceeds leave the debtor's hands or whether it continues only in identifiable proceeds in the hands of the debtor." (731 P.2d at p. 748.)

The court adopted the latter interpretation on both issues, holding that "received by the debtor" refers to "identifiable proceeds" and that there is no security interest in proceeds after they have left the debtor's hands.

The last foreign state case which Amstar relies on is *Graves Equipment, Inc.* v. *M. DeMatteo Const., supra,* 397 Mass. 110 [489 N.E.2d. 1010]. There the court ruled that a general contractor could retain monies it held by virtue of its claim against a subcontractor when the subcontractor had assigned his right to receive those monies to a third party creditor. The case turns not on Uniform Commercial Code section 9-306 and the definition of proceeds, but upon the interpretation of Uniform Commercial Code section 9-318 and the ability of the debtor to assert the defenses it had against the assignor in a suit by the assignee.

Authorities in other states reaching the opposite conclusion are best exemplified by *Baker Production Cr. Ass'n* v. *Long Creek Meat Co., Inc.* (1973) 266 Ore. 643 [513 P.2d 1129]. There, Deer Creek Cattle Feeders financed its operation through Baker, and gave to Baker a security agreement covering current and after-acquired livestock and proceeds from the sale of livestock. Deer Creek sold its cattle to Long Creek Meat Co., which issued checks in payment directly to Baker. Long Creek was financed by a line of credit from First State Bank. Long Creek slaughtered the cattle and sold the carcasses to Coast Packing. Coast paid for the carcasses by issuing checks to First State Bank, which then applied the funds to the preexisting debt account of Long Creek. When Long Creek fell behind on its obligations to First State Bank, the bank stopped honoring Long Creek's checks to Baker. However, the bank continued to receive checks from Coast and applied them on Long Creek's account.

Baker brought suit against Long Creek, Coast, and First State Bank. The issue important to the present case is whether the monies paid by Coast to the bank were "proceeds" within the meaning of Oregon law, Oregon

Revised Statutes 79.3060(1).[2] The court rejected the argument that those funds were not proceeds because they were not received by Long Creek. It found that the Coast checks which were paid to the bank were proceeds subject to the Baker security interest, even though they were paid to the bank rather than to the seller or debtor. In so holding, the *Baker* court noted *Farnum* v. *C. J. Merrill, Inc.* (Me. 1970) 264 A.2d 150: "'We find nothing to support Receiver's contention that the words "whatever is received" in line one of 9-306(1) means "whatever is received by debtor." Paragraph (1) does not impose that limitation and the fact that paragraph (2) expressly includes collections received by debtor, argues that the proceeds in paragraph (1) has an independent meaning broad enough to include receipts by a receiver . . . . We are satisfied that paragraph (1) is to be read: "'Proceeds'" include whatever is received by anyone.'" (*Baker Production Cr. Ass'n* v. *Long Creek Meat Co., Inc., supra,* 513 P.2d 1129, 1132-1133.)

California courts have never directly addressed the issue now before us. Several courts have, however, held that the term "proceeds" should be interpreted broadly. (See *Johanson Transportation Service* v. *Rich Pik'd Rite, Inc.* (1985) 164 Cal.App.3d 583 [210 Cal.Rptr. 433]; *In the Matter of Munger* (9th Cir. 1974) 495 F.2d 511.)

*Imperial NH3* v. *Central Valley Feed Yards, Inc.* (1977) 70 Cal.App.3d 513 [139 Cal.Rptr. 8] likewise defines the term "proceeds" to include more than simply monies received by the debtor. While the facts vary somewhat from those we are considering, they bear mentioning briefly. Nale, a farmer, was financed by Wells Fargo Bank, which took a security agreement in Nale's crops, but not the proceeds. Thereafter, Nale became indebted to Imperial for products he had purchased. In order to protect itself, Imperial received a security agreement in the crops and proceeds. Without plaintiff's knowledge, Nale obtained advances from Central Valley Feed, and in return he delivered his crops to Central Valley, which would credit Nale's account as they were received. As soon as Imperial discovered that Nale was delivering his crops to Central Valley, rather than selling them as he had previously done in the ordinary course of business, it notified Central Valley of its secured position in the sale proceeds. On the question whether the account that arose upon delivery of the crops constituted proceeds, the court held:

". . . 'proceeds' includes 'the account arising when the right to payment is earned under a contract of rights.' (Cal. U. Com. Code, § 9306, subd. (1).)

---

[2] Oregon Revised Statutes 79.3060(1) provided: "'Proceeds' includes whatever is received when collateral or proceeds is sold, exchanged, collected or otherwise disposed of."

Upon delivery of the hay to [buyer], an account in favor of [debtor/seller] arose. This account was subject to [creditor's] lien on the 'proceeds' and could not be 'offset' by [buyer] in derogation of [creditor's] rights. . . ." (*Id.* at p. 520.)

Consistent with the California authorities which give a broad interpretation to the term "proceeds," we hold that the crop monies held by Amstar as consideration for the purchase of Borboa's sugar beets were proceeds within the meaning of section 9306, subdivision (1). The account that was thus created became proceeds regardless of the fact that none of the funds would be paid to Borboa.

D. *Producers's Authorization for the Crop Sale Did Not Relinquish Its Security Interest in the Proceeds.*

Even though, by the terms of section 9306, subdivision (2), Producers lost its secured position in the crop, the question remains whether its authorization to sell likewise relinquished its interest in the proceeds. Again, California courts appear not to have determined this issue.

Courts in other jurisdictions have scrutinized the secured creditor's position surrounding an implied sale not authorized in the security agreement to determine if the creditor has relinquished its lien in the proceeds of sale. Generally the courts follow one of three approaches.

Some courts have found waiver of a security interest in both the collateral and proceeds. The 10th Circuit Court of Appeals reached this conclusion in *First Nat. Bank, etc.* v. *Iowa Beef Processors* (10th Cir. 1980) 626 F.2d 764. Even though the bank conditioned its consent to sale of cattle on receipt of the proceeds of sale, failure of the condition did not prevent consent from cutting off the bank's security interest under the Oklahoma's version of Uniform Commercial Code section 9-306, subdivision (2). The bank consented to the debtor's sale of the cattle in his own name "provided" he remit the proceeds by his own check to the bank. The court rejected that condition because the bank made performance of the debtor's duty to remit proceeds a prerequisite to releasing the third party good faith buyer from liability, something the buyer had no control over. (See also *Parkersburg State Bank* v. *Swift Ind. Packing Co.* (8th Cir. 1985) 764 F.2d 512 and *Peoples Nat. Bank and Trust* v. *Excel Corp.* (1985) 236 Kan. 687 [695 P.2d 444]—creditor's consent for debtor to sell collateral and receive proceeds contrary to the terms of the security agreement was a waiver of creditor's security interest.)

In a second line of cases, other courts have refused to find a waiver of the security interest in collateral or proceeds where the sales transaction did not

meet a condition set forth in the implied sales authorization by the secured party. In *In re Ellsworth* (9th Cir. 1984) 722 F.2d 1448, the court held where the course of dealing was that when the debtor sold cattle it obtained cash and paid the secured creditor, at which time the creditor released its security interest in the cattle sold, the creditor's security interest was not cut off when the debtor sold cattle to a third party who did not pay for the cattle. The court stated: "We find it difficult to say that the course of dealing requires that Tri-State's [secured party] security interest must be deemed to have been released in such a case. In cases where Tri-State was paid, its security interest in the sold cattle was satisfied, and it therefore was released. To apply such a 'course of dealing' to a case in which Tri-State was not paid is to defeat the security interest in the very situation in which it was designed to protect Tri-State. That is what [Uniform Commercial Code section 9-306, subdivision (2)] is about." (*Id.* at pp. 1450-1451.)

Finally, a third line of cases has held that a creditor's course of dealing, which impliedly authorized a sale of the collateral, resulted in the creditor losing its security interest in the collateral but not in the proceeds. *Rudio* v. *Yellowstone Merchandising Corp.* (1982) 200 Mont. 537 [652 P.2d 1163], stated Uniform Commercial Code section 9-306, subdivision (2) reserves the right to proceeds notwithstanding the creditor's authorization to sell the collateral. Whether the sale was authorized determines only the secured party's right to obtain possession of the collateral after the sale. It in no manner affects his interest in the retained proceeds as against competing creditors. (*Id.* at pp. 1168-1169.)

In *Humboldt Trust & Sav. Bank* v. *Entler* (Iowa App. 1984) 349 N.W.2d 778, the court held the creditor's past course of dealing impliedly authorized sale of crop collateral, thus, the creditor lost its security interest in the crops. However, the course of dealing upon which the creditor relied also included the debtor's remittance of the proceeds. Under those facts, the creditor did not waive its security interest in the proceeds. (*Id.* at pp. 781-782, 783. See also *Aberdeen Prod. Credit* v. *Redfield Livestock* (S.D. 1985) 379 N.W.2d 829, 832, where the security agreement covered proceeds and a proper financing statement perfected the creditor's interest in the proceeds. Even assuming the creditor consented to the sales, the security interest in identifiable proceeds was retained.)

■ In analyzing Producers's interest, the trial court followed the third line of cases and found it authorized the sale of Borboa's sugar beets to Amstar. Thus, Amstar took the crop free of Producers's security interest. However, Producers's acquiescence in the sale was conditioned on the security interest continuing in the proceeds, and no waiver or relinquishment of the security interest in the sugar beet proceeds occurred.

We agree with that conclusion. Enabling the buyer to take the *collateral* free of the security interest when the secured party authorizes the sale protects the buyer and promotes one of the underlying purposes of the California Uniform Commercial Code, to simplify and clarify the law governing commercial transactions. (§ 1102, subd. (1).) On the other hand, we see no logical reason why the secured party need forfeit its security interest in the *proceeds*. Producers's security interest, duly perfected, gave notice to all the world, including Amstar, that it claimed an interest in the crop proceeds. In addition, Producers directly notified Amstar of its interest and committed no act which would lead Amstar to believe that it had relinquished its interest in the proceeds. Unlike the secured creditors in *First Nat. Bank, etc.* v. *Iowa Beef Processors, supra,* 626 F.2d 764, *Parkersburg State Bank* v. *Swift Ind. Packing Co., supra,* 764 F.2d 512 and *Peoples Nat. Bank and Trust* v. *Excel Corp., supra,* 695 P.2d 444, Producers did not authorize Amstar to pay Borboa directly. Producers's assignment required Amstar to remit all proceeds to Producers. No injustice results where the party liable controls fulfillment of the condition. (*Moffat Cty. State Bank* v. *Producers Livestock Mktg.* (D.Colo. 1984) 598 F.Supp. 1562, 1568.)

## II

*Amstar Was Not a Buyer in the Ordinary Course of Business—Section 9307*

Amstar next contends that it took the crop and proceeds free of Producers's security interest under section 9307, subdivision (1),[3] because Amstar was a buyer in ordinary course of business.

Section 9307, subdivision (1) states: "A buyer in ordinary course of business (subdivision (9) of Section 1201) takes free of a security interest created by his seller even though the security interest is perfected and even though the buyer knows of its existence."

Section 1201, subdivision (9) defines "buyer in ordinary course of business" as one who in good faith and *without knowledge that the sale to him is in violation of the ownership rights or security interest of a third party* in the goods buys in ordinary course from a person in the business of selling goods of that kind."

Read together the sections provide the buyer takes free of the security interest if he merely knows there is a security interest which covers the

---

[3] California Uniform Commercial Code section 9307, subdivision (1), unlike Uniform Commercial Code section 9-307, subdivision (1), does not exclude purchases of farm products from its coverage, so in California a buyer in ordinary course may take farm products free of security interest created by his seller.

goods, but takes subject to the security interest if he knows the sale is in violation of some term in the security agreement not waived by the words or conduct of the secured party. (Cal. Law Revision Com. com., 23C West's Ann. Cal. U. Com. Code, § 9307 (1988 pocket pt.) p. 138.)

 The trial court found Amstar was not entitled to buyer in ordinary course protection. Amstar bought the crop without actual knowledge Borboa's sale to Amstar violated the security agreement's requirement of written consent for sale. But Amstar personnel knew without a signed subordination agreement the payment of crop proceeds to Williams violated Producers's security interest in those proceeds.

Amstar submits there is insufficient evidence its personnel had actual knowledge payment to Williams was a violation of the security agreement. In support of its position, it points out Bozzini testified he did not know Borboa had a security agreement and did not know who provided his financing. He requested subordination only because it was a corporate policy. Frank Hunt testified he knew Producers financed Borboa but did not know any of the terms of the agreement.

The record demonstrates ample evidence to support the court's finding. Amstar personnel understood Producers had a continuing assignment in Borboa's 1981 crop proceeds. When the clerical employee of Amstar advanced Williams $80,600 as payment for the 1980 and 1981 harvesting costs, both Bozzini and Hunt knew Amstar could not pay Williams without obtaining a subordination agreement because Producers had a superior interest in the proceeds.

In addition to the court's finding that Amstar knew payment to Williams was in violation of Producers's interest, another reason can be found why Amstar was not a buyer in the ordinary course of business. Of the total amount paid to Williams, $10,000 was for the prior year's harvesting. No new value was given.

In *United States* v. *Handy and Harman* (9th Cir. 1984) 750 F.2d 777, the court, applying California law, held that a buyer in ordinary course does not take free of a security interest in collateral when he fails to give new value for the collateral. The code requires the buyer in ordinary course to give new value in exchange for the goods in order to protect the position of the financier. The financier is protected because his security interest in the inventory will attach to the new value, the proceeds. If the rule were otherwise, and the buyer who received the goods in satisfaction of a preexisting debt were permitted to keep them free of security interests, the effect would be to enable an unsecured creditor—the buyer—to bootstrap himself into

priority over the secured creditor who looks to the goods for security. (*Id.* at p. 782.)

Amstar did not qualify as a buyer in ordinary course of business regarding the $10,000 payment to Williams for the preexisting debt from the 1980 harvest.

## III

*Producers's Rights to the Crop Proceeds Paid to Williams Were Not Limited by the Terms of the Amstar-Borboa Sales Contract—Section 9318*

A. *Amstar's Claim for the Harvesting Costs Did Not Arise Out of the Sales Contract.*

Under section 9318, subdivision (1)(a), the terms of the contract to which the assignee is subject include all claims arising out of the contract between the assignor and the account debtor. Section 9318, subdivision (1) reads: "(1) Unless an account debtor has made an enforceable agreement not to assert defenses or claims arising out of a sale as provided in Section 9206 the rights of an assignee are subject to [¶] (a) All the terms of the contract between the account debtor and assignor and any defense or claim arising therefrom; . . ." The assignee in this case, Producers, stands in the same position as the assignor, Borboa, in relation to crop proceeds. (*James Talcott, Inc.* v. *H. Corenzwit & Co.* (1978) 76 N.J. 305 [387 A.2d 350, 352].)

The sugar beet sales contract allows various "standard" deductions for waste, dirt hauling, curly top virus control and California Beet Growers Association dues. The contract also provided Amstar would provide beet seed to Borboa at a given price. In addition, Amstar could deduct "any indebtedness to the company from Grower of whatever character and whether incurred or accruing prior or subsequent to notice to the Company of Grower's assignment of any proceeds thereunder."

The court allowed the standard deductions and those made for seed under section 9318, subdivision (1) because both were contemplated in the contract. It disallowed the deduction for harvesting costs because that claim arose independent of the sales contract and did not accrue before Amstar was notified of the assignment.

Amstar contends the payment to Williams was deductible because it was an indebtedness of Borboa to Amstar and was addressed under paragraph 4 of the sales agreement. Amstar's argument is without merit. The contract

entered into between Borboa and Williams did not create a "claim arising out of the [beet sale] contract." The harvesting contract was made more than three months after the sales contracts were signed. It involved subject matter and a third party claim not included in the sales contract. Borboa's agreement to pay Williams was, in effect, a personal debt of Borboa which Amstar agreed to pay for him.

■ As a general rule, a debtor will not be discharged from his obligations by performance rendered to the assignor after notice of the assignment. (*Jones* v. *Martin* (1953) 41 Cal.2d 23, 27-28 [256 P.2d 905].) And a purchaser of secured collateral cannot offset personal debts of the seller against the proceeds of sale owing to the secured party absent the secured party's acquiescence. (*First Nat. Bank, etc.* v. *Iowa Beef Processors, supra,* 626 F.2d 764, 769.)

*Bank Leumi Tr. Co., etc.* v. *Collins Sale Serv.* (1979) 47 N.Y.2d 888 [419 N.Y.S.2d 474, 393 N.E.2d 468] is instructive. Plaintiff Bank Leumi was the assignee of the accounts receivable of Precision Graphics, Inc. Sesco Design, Inc., was the account debtor of Precision. Precision was indebted to a third party, Collins Sale Service, Inc. Precision, Sesco and Collins agreed that Sesco's debt to Precision, in which Bank Leumi had a security interest, would be used to pay off Precision's debt to Collins. The result of the agreement was to decrease the bank's security with an agreement to which the bank was not a party. The New York Court of Appeal, analyzing the facts under Uniform Commercial Code section 9-318, subdivision (1)(a), held that the arrangement was a collateral agreement which could not be set off against the bank's security interest. (*Id.* at pp. 469-470.)

■ Applying that reasoning to the facts of this case, section 9318 subjects the security interest of the assignor only to those claims or defenses the account debtor has against the assignor. Williams was not the account debtor. Amstar cannot transfer Williams's claim to itself and thereby convert an unsecured claim to an authorized setoff under section 9318.

B. *The Claim of Williams Arose After Amstar Was Notified of Producers's Assignment.*

■ The agreement to pay Williams did not create a claim which arose out of the sales contract, thus it must be analyzed under section 9318, subdivision (1)(b) which provides: "Unless an account debtor has made an enforceable agreement not to assert defenses or claims arising out of a sale as provided in Section 9206 the rights of an assignee are subject to [¶] [¶] (b) Any other defense or claim of the account debtor against the assignor which accrues before the account debtor receives notification of the assignment."

If the account debtor has claims against the assignor which arise independently of the contract, the assignee is subject to all such claims which accrue before, and free of all those which accrue after, the account debtor is notified of the assignment. (Cal. Law Revision Com. com., 23C West's Ann. Cal. U. Com. Code, § 9318 (1988 pocket pt.) p. 149.)

The record supports the trial court's finding that Amstar had constructive and actual notice that the proceeds of Borboa's sugar beet crop were assigned to Producers before all crops were delivered and before Amstar agreed to pay Williams out of the proceeds. Accordingly, section 9318, subdivision (1)(b) does not permit Amstar to claim the harvesting payments to Williams as an offset against the proceeds of Borboa's 1981 sugar beet crop.

C. *Precode Law.*

■ Amstar submits the precode case of *Fricker* v. *Uddo & Taormina Co.* (1957) 48 Cal.2d 696 [312 P.2d 1085], authorizes payment to Williams. The California Supreme Court held that any assignment of monies to become due under an executory contract is subject to advances which are necessary for the assignor to perform his contract. This holding created an exception to the general rule the rights of an assignee, including his rights in a fund to become due to the assignor, cannot be destroyed by payments made by the debtor to the assignor after notice of the assignment. (*Id.* at p. 701.)

The *Fricker* rule is no longer the law in California. *Imperial NH3* v. *Central Valley Feed Yards, Inc., supra,* 70 Cal.App.3d 513 [139 Cal.Rptr. 8], held when a creditor holds a security interest in the goods of a debtor/seller, an advance for operating expenses from the buyer of the secured goods to the seller constituted an unsecured debt which could not be offset against the buyer's promise to pay the total purchase price of the crop to the creditor.

"An unsecured creditor should not prevail over a prior secured creditor simply because he purchased the collateral (Cal. U. Com. Code, § 9201). Since an unperfected security interest is subordinate to a prior perfected security interest (Cal. U. Com. Code, § 9312, subd. (5)), it follows that an unsecured creditor is subordinate to a creditor having a perfected security interest . . . ." (*Id.* at p. 520.)

D. *Modification of the Sale Contract.*

■ Amstar further contends that if section 9318, subdivision (1)(a) did not authorize the deductions, they were permitted by a good faith

modification of the sugar beet sales contract pursuant to section 9318, subdivision (2).

Section 9318, subdivision (2) provides: "(2) So far as the right to payment or a part thereof under an assigned contract has not been fully earned by performance, and notwithstanding notification of the assignment, any modification of or substitution for the contract made in good faith and in accordance with reasonable commercial standards is effective against the assignee unless the account debtor has otherwise agreed but the assignee acquires corresponding rights under the modified or substituted contract. . . ."

The agreement to pay Williams was reached before all crops were delivered to Amstar and was timely under the section. However, the evidence does not support Amstar's claim that the modification was made in good faith[4] and in accordance with reasonable commercial standards.

Amstar had notice of Producers's security interest in Borboa's 1981 beet crop proceeds and Producers's right to the proceeds by virtue of the continuing assignment. Amstar understood that it had to request the subordination of the Producers's assignment in order to pay the proceeds to another party. In addition, Amstar admitted that paying Williams was a breach of its internal policies. Nevertheless, as the result of an error by a clerical employee of Amstar, and without Producers's knowledge, Amstar paid Williams from the crop proceeds and refused to tender payment to Producers. In effect, Amstar attempted to shift the consequence of its mistake to Producers in derogation of Producers's security interest in the proceeds. The facts do not merit a finding of good faith and commercial reasonableness.

## IV

### Producers Was Unjustly Enriched

Aside from the effect of the application of the California Uniform Commercial Code to the transaction, the facts present a classic case for establishing an implied in law contract, or quasi-contract, between Producers and Amstar which would allow Amstar to retain $43,336.35 for harvesting costs it paid to Williams.

· Amstar advanced the costs, albeit mistakenly, so that the sugar beet crop could be harvested in a timely manner. Producers's gin manager knew the

---

[4]Good faith means "honesty in fact in the conduct or transaction concerned." (§ 1201, subd. (19).)

crop was being harvested and made no inquiry of Borboa about how those costs were to be paid. Because the crop was harvested, Producers benefitted by receipt of the net proceeds of sale. Thus, the facts satisfy the requirement that a recipient of services performed either requested or acquiesced in them (*Young* v. *Bruere* (1926) 78 Cal.App. 127 [248 P. 301]), and the requirement that the party to be charged with payment for a service received a benefit (*Palmer* v. *Gregg* (1967) 65 Cal.2d 657 [56 Cal.Rptr. 97, 422 P.2d 985]).

In *Young* v. *Bruere, supra,* 78 Cal.App. 127, an attorney performed services the client had not requested but to which he had acquiesced. The services were rendered in connection with certain estate property in which defendants were jointly interested. Defendants took an active part in conferences and court proceedings, consulted with the attorney about the matter at various stages and expressly agreed to negotiate for a compromise. The court found the circumstances were such that the client might reasonably know that he would be expected to pay for the service.

In *Palmer* v. *Gregg, supra,* 65 Cal.2d 657, plaintiff moved from her home in Palm Springs to Los Angeles at the request of decedent in order to care for decedent during the last 10 months of his life. After decedent's death, plaintiff filed suit against the estate for certain expenditures she had made, basing her claim on a quantum meruit, or quasi-contractual, theory. At issue before the Supreme Court was the propriety of the award by the trial court of $517.04 for gardening services for plaintiff's Palm Springs home while she was tending to decedent and his estate. It held that the award for gardening services was improper because they were not a benefit received by decedent.

"The measure of recovery in *quantum meruit* is the reasonable value of the services rendered, provided they were of direct benefit to the defendant. [Citations.] . . . The facts of the present case suggest no exception to the general rule: plaintiff's personal gardening expenses conferred no direct benefit on decedent, and accordingly cannot be recovered in this action." (*Palmer* v. *Gregg, supra,* at pp. 660-661.)

Under the common law equitable doctrine of implied in law or quasi-contract, therefore, Amstar had the right to recover from Producers the costs of the 1981 harvest by way of offset. The issue then becomes whether a claim based upon principles of unjust enrichment prevails over a claim based upon a properly perfected security interest pursuant to article 9 of the California Uniform Commercial Code.

Producers directs us to subdivisions (1) and (2) of section 1102, which provide in part: "(1) This code shall be liberally construed and applied to promote its underlying purposes and policies.

"(2) Underlying purposes and policies of this code are [¶] (a) To simplify, clarify and modernize the law governing commercial transactions; [¶] (b) To permit the continued expansion of commercial practices through custom, usage and agreement of the parties;

". . . . . . . . . . . . . . . . . . . ."

Amstar, on the other hand, points to section 1103, which states: "Unless displaced by the particular provisions of this code, the principles of law and equity, including the law merchant and the law relative to capacity to contract, principal and agent, estoppel, fraud, misrepresentation, duress, coercion, mistake, bankruptcy, or other validating or invalidating cause shall supplement its provisions."

Producers contends that in order to give stability and predictability to commercial transactions, the priorities dictated by article 9 must prevail over equitable principles that might otherwise apply. Amstar counters that article 9 does not displace or prohibit the application of equitable principles, and to allow retention of the funds by Amstar as against Producers, who acquiesced in the harvesting and benefitted from it, does not render the California Uniform Commercial Code priorities uncertain, but rather leads to a fair result under these particular facts.

Resolution of this conflict appears never to have been addressed by the California courts. Nor does the California Uniform Commercial Code itself provide an answer. ▇▇▇ We agree with the position of Amstar and hold that when a party possessing a security interest in a crop and its proceeds has knowledge of and acquiesces in expenditures made which are *necessary* to the development of the crop, and ultimately benefits from the expenditures, a party who, through mistake, pays such costs without first obtaining subordination, is entitled to recover. In this case, that recovery is limited to the 1981 harvesting cost, $43,336.35.

V

*Producers's Assertions of Error*

Producers did not appeal. However, it asserts the trial court erred on two points: first, in concluding that the sale of the collateral to Amstar was authorized and second, in finding that the standard deductions and deductions for beet seed were properly taken.

Code of Civil Procedure section 906 provides: ". . . The respondent, or party in whose favor the judgment was given, may, without appealing from

such judgment, request the reviewing court to and it may review any of the foregoing matters for the purpose of determining whether or not the appellant was prejudiced by the error or errors upon which he relies for reversal or modification of the judgment from which the appeal is taken. The provisions of this section do not authorize the reviewing court to review any decision or order from which an appeal might have been taken."

Accordingly, we decline to consider issues raised by any portion of the statement of decision which are contended by respondent to have been erroneously decided, but which have not been brought to this court by way of appeal.

The judgment is reversed and the cause remanded to entry of judgment consistent with this opinion. Appellant to recover costs on appeal.

Woolpert, Acting P. J., and Ballantyne, J., concurred.

Respondent's petition for review by the Supreme Court was denied March 23, 1988.